In re Petition of State ex rel. Attorney General and others (Tavern Code Authority).

*November 9, 1935—January 7, 1936.*

For the petitioners Phelps, Bauer, Kelly, and Shires there were briefs by *Howard P. Haberla,* attorney, and *Fred R. Wright, Roland J. Steinle,* and *Herbert S. Thatcher* of counsel, all of Milwaukee, and oral argument by *Mr. Thatcher* and *Mr. Wright.*

For the State there were briefs by the *Attorney General* and *Fred M. Wylie,* special counsel, attorneys, and *C. J. Marsh,* counsel for the Wisconsin Recovery Administration of counsel, and oral argument by *Mr. Wylie* and *Mr. Marsh.*

A separate brief was filed by *C. J. Marsh,* counsel for the Wisconsin Recovery Administration, as *amicus curiæ.*

A brief was filed for the Wisconsin Highway Construction Industry by *Bitker, Tierney & Puchner* of Milwaukee.

A brief was filed by *Lines, Spooner & Quarles, amici curiæ,* and *Louis Quarles, Leo Mann,* and *Maxwell H. Herriott* of counsel, all of Milwaukee.

A brief was filed by *Lloyd D. Mitchell* of Oshkosh, as *amicus curiæ.*

ROSENBERRY, C. J.

*Jurisdiction.*

A preliminary question is raised. It is urged that this court has no jurisdiction of an original action brought under sec. 269.56. (Uniform Declaratory Judgments Act.) By that section it is provided:

"(1) Courts of record within their respective jurisdictions shall have power to declare rights, status," etc.

It cannot be argued that the supreme court of the state of Wisconsin in the exercise of its original jurisdiction is not a court of record. It is pointed out, however, that the constitution of this state provides:

"Art. VII, sec. 3. The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only. . . . The supreme court shall have a general superintending control over all inferior courts; it shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same."

It is argued that the Uniform Declaratory Judgments Act as adopted in this state is an enlargement of the jurisdiction of this court; that it is beyond the competency of the legislature under the constitution to add to or take from the jurisdiction conferred upon this court by the constitution. Consequently, the court has no jurisdiction of an action brought under sec. 269.56. If the premise is sound, the conclusion inevitably follows.

We address ourselves, therefore, to the inquiry of whether or not the Uniform Declaratory Judgments Act enlarges the jurisdiction of this court. The whole philosophy underlying the Uniform Declaratory Judgments Act is that it enables controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been committed or threatened. (Borchard, Declaratory Judgments, p. 3.) No court takes jurisdiction under the Uniform Declaratory Judgments Act of a subject matter of which it would not have jurisdiction in a remedial action. The Uniform Declaratory Judgments Act merely authorizes the court to take jurisdiction at a point earlier in time than it would do under ordinary remedial rules and procedure. If an act of the legislature provided that an action of replevin could be maintained without proving a demand for the return of the property, that act would not enlarge the jurisdiction of any court. In determining whether or not this court should take jurisdiction in response to a petition of a litigant for leave to institute an action in this court, the court does not look to the Uniform Declaratory Judgments Act as a basis for decision. It looks to the constitution as expounded and applied by this court. The principles upon which the court proceeds are summarized and laid down in *Income Tax Cases,* 148 Wis. 456, 134 N. W. 673, 135 N. W. 164, and subsequent decisions of this court.

When it appears from the petition that a controversy is presented which falls within some one of the classes enumerated in that case, the court takes jurisdiction. After the court has taken jurisdiction and pursuant to leave granted complaint has been filed and issue joined, the court may then examine the complaint to see whether or not under the Uniform Declaratory Judgments Act, a cause of action is stated. The jurisdiction of this court is not enlarged because of certain procedural changes in the law. As was said by the su-

preme court of the United States in *Nashville, C. & St. L. R. Co. v. Wallace,* 288 U. S. 249, 264, 53 Sup. Ct. 345, 348:

"The judiciary clause of the constitution defined and limited judicial power, not the particular method by which that power might be invoked. It did not crystallize into changeless form the procedure of 1789."

In *Ellis v. Davis,* 109 U. S. 485, 486, 3 Sup. Ct. 327, 334, it was said:

"It has often been decided by this court that the terms 'law' and 'equity' . . . do not restrict the jurisdiction conferred by it [the constitution] to the very rights and remedies then recognized and employed, but embrace as well not only rights newly created by statutes of the states, . . . but new forms of remedies to be administered in the courts of the United States, according to the nature of the case."

Borchard, Declaratory Judgments, p. 136, and cases cited.

It is the nature of the controversy presented by the petition which determines whether or not this court will take jurisdiction, not the procedure to be followed by the court after jurisdiction has been taken. This case seems to be well within the classification set out in the *Income Tax Cases, supra.* It is alleged in the petition that—

"the question of the constitutionality of ch. 110 of the Wisconsin Statutes affects innumerable members and employees of industry throughout Wisconsin and is of vital concern also to the entire public. Until the question is determined finally by this court, uncertainty and doubt of their legal duties and obligations will exist in the minds of innumerable citizens of the state, and confusion and inability to stabilize will exist in many Wisconsin industries."

It further appears that pursuant to the provisions of ch. 110, Stats., certain codes of fair competition and trade practices have already been set up which include maximum hours, minimum wages, health provisions, and other measures for the protection of the public; if the statute under

which the various state agencies have proceeded is invalid and unconstitutional, that illegal burdens will be imposed upon the citizens of the state. From the very nature of the case it appears that the sovereignty of the state is involved for the reason that the lawmaking power of the state is to be exercised by certain administrative agencies. The case, therefore, seems beyond doubt to be *publici juris,* involves the exercise of the sovereign power of the state, the conduct of its high officials, and the welfare of its citizens.

There is no doubt from the allegations of the petition that an actual controversy exists as between the officials charged with the administration and enforcement of the law and members of the tavern industry, and that the issue is real and not feigned. For the reasons given in *State ex rel. Wisconsin Tel. Co. v. Henry,* 218 Wis. 302, 260 N. W. 486, the court takes jurisdiction of this action.

*Constitutionality of ch. 110 of the Statutes of 1935.*

On behalf of the state of Wisconsin, the attorney general argues that the legislature acted within constitutional limitations of its powers in the enactment of ch. 110, Stats., 1935. The representatives of the tavern industry, petitioners here, argue that the act is void because it attempts to confer upon the governor and administrative agencies to be created by him legislative powers which cannot be delegated. Ch. 110 of the Statutes of 1935 is commonly referred to as the Wisconsin Recovery Act (W. R. A.). Because of the fact that in the course of the opinion it will be necessary to refer to ch. 110 of the Statutes of 1933, which has also been described as the Wisconsin Recovery Act, we shall be obliged to resort to the chapter number in each instance where reference is necessary. An orderly consideration of the question presented requires us to point out the changes made in ch. 110, Stats. 1933, by the enactment of ch. 182, Laws of 1935. Sec. 110.01 being a declaration of policy was not changed. Sec. 110.02 relating to the duration provides that

the chapter and the codes adopted pursuant thereto should remain in effect until July 25, 1937, unless sooner terminated by the governor. Sec. 110.03 provides that the governor may delegate certain of the powers and functions conferred upon him by the chapter.

Sec. 110.04 was entirely rewritten and is set out in the margin.[1]

[1] "110.04 *Codes of fair competition and trade practices.* (1) (a) Methods of competition in business and trade practices shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited. The governor is hereby vested with the power and jurisdiction and it shall be his duty to investigate, ascertain, declare and prescribe reasonable codes or standards of fair competition and trade practices for the various trades and industries in the state in which the competition is essentially and preponderantly intrastate or for certain trade areas within the state, and to make reasonable classification of persons, employments and standards of fair competition and trade practices in such business. In determining trade areas the proximity thereof to state lines may be taken into consideration. Such codes or standards of fair competition and trade practices shall be prescribed and approved by the governor after such reasonable public notice and hearing as he shall specify and if he finds (1) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them and will tend to effectuate the policy of this chapter, and (2) that such code or codes are not inequitable and that the interests of the consumers and the general public will be protected, and (3) that such code is necessary for the stabilization of the intrastate business of such trade or industry. The governor may, as a condition of approval of any such code, impose such conditions (including requirement for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees and others, and in the furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code as the governor in his discretion deems necessary to effectuate the policy declared in this chapter. . . . In case of a conflict between a provision of this chapter or a code approved thereunder, and a statute administered by the public service commission of Wisconsin or a lawful order thereunder, the latter shall prevail; provided, however, that . . . the provisions of this chapter shall not apply to owners and operators of trucks in the hauling of farm products, produce or supplies to or from the farm. Licensed hotels and the trades or businesses operated in connection therewith, and trades or industries selling, installing or servicing more than one line of merchandise or service shall for the purpose of this chapter be considered as one trade or industry, and be subject to the code approved for said hotel or industry, provided, however, that barber shops wherever operated shall be subject to the code for the barber industry.

" (b) Upon the approval of any such code covering any trade or industry or subdivision thereof, all persons, firms or corporations engaged in such trade or industry or subdivision thereof, shall, as to the intrastate trade or business carried on by them, be bound by such code and

The other sections were not amended in any respect material to the issues in this case.

Sec. 110.10 is new and is as follows:

"110.10 *Separability of provisions.* The legislature intends that the provisions· contained in sections 110.01 to 110.09, inclusive, shall be independent of each other and that the invalidity for any reason of any of said sections, or any subsection, paragraph or clause thereof, shall not affect the validity of any other section, subsection, paragraph or clause thereof."

It is our duty, in the event we find that the act is ambiguous or the interpretation to be placed upon it doubtful, to so construe it that it may be upheld if that is possible. If, however, the act is plain and unambiguous and in contravention of the constitution or if, subject to construction, it cannot be so construed that it will meet constitutional requirements, then we must as a matter of duty declare it unconstitutional.

---

any standards adopted ·and approved by the governor subject only to such exemptions to the application thereof as may be provided in the approved code or imposed by the governor as a condition of the approval of the code.

" (2) Among other things, codes of fair competition and business practices shall establish standards of maximum hours of labor, minimum rates of pay and working conditions. If any code shall provide that it shall constitute unfair competition to sell below cost of production, or reasonable cost, the governor may, upon approval of any such code containing such provision, provide a method for determining said cost of production or reasonable cost and make such provisions in relation to the enforcement thereof as he may from time to time determine. Any farmer or dairyman who elects to come under this code shall be entitled to the cost of production plus a reasonable profit. Every code of fair competition or agreement approved, prescribed, or issued under this title shall contain the following conditions:

" (a) That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or. coercion of employers of labor, or their agent, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection;

" (b) That no employee and no one seeking employment shall be required, as a condition of employment, to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing.

" (3) After the governor shall have approved any code and the same shall have been published in the manner provided in sections 35.64 and

A determination of the matters presented for decision involves the consideration of certain circumstances which do not ordinarily arise in cases of this kind. Ch. 110, Stats. 1933, was created by ch. 476, Laws of 1933, as ch. 109, being thereafter renumbered ch. 110. The constitutionality of that act was considered by. this court in *Gibson Auto Co. v. Finnegan,* 217 Wis. 401, 259 N. W. 420, and it was there held that the legislature could not in effect abdicate its legislative functions and delegate the lawmaking power to the individuals engaged in certain industries, and for the reasons there stated the act was void *in toto*. That case was decided March 5, 1935. In the course of the opinion regret was expressed by the court that it did not have the benefit of a definitive opinion by the supreme court of the United States as to the validity of the act of congress attempting to delegate to the President of the United States the power to ap-

35.65, the provisions of such code shall be the standards of fair competition for the intrastate business of the trade or industry to which the code or codes apply.

"(4) All orders of the governor prescribing, approving, disapproving, modifying, amending or terminating codes shall be subject to review in the same manner in which orders and awards of the industrial commission are made reviewable by subsections (1), (2) and (3) of section 102.23, and by sections 102.24 and 102.25 of the statutes, except that the summons in the action for review shall be served upon the governor or such officer or agent as he may from time to time by executive order designate, and that the term 'commission' as used in said sections shall be construed to read 'governor.' In any such action brought to review an order prescribing or approving a code, no injunction suspending the operation of the code or any part thereof during the pendency of the action shall be granted except upon the filing and approval by the court of a good and sufficient bond, running to the governor and enforcible by him, on behalf of all parties in interest, conditioned for the payment of all damages, loss of profits and of wages which may be sustained by any employer or employee in the industry by reason of such suspension, in the event the validity of the code shall be finally sustained.

"(5) The several circuit courts of the state are hereby vested with jurisdiction to prevent and restrain violation of any code of fair competition and business practices approved under this section and it shall be the duty of the several district attorneys in their respective districts, under the direction of the attorney-general, to institute proceedings in equity to prevent and restrain such violations. Any trade or industrial association or group or any person who is a member thereof who is damaged by a violation of a code may petition the circuit court having jurisdiction to restrain such violations.''

prove or prescribe codes of fair competition. (National Industrial Recovery Act, 48 U. S. Stat. at L. 195.) While the subject matter with which the legislature of a state may deal in the exercise of the so-called police power differs from the subject matter with which congress may deal in the exercise of a similar power, both as to extent and derivation, nevertheless a determination of the question whether a power conferred upon the legislature or a power conferred upon congress may be lawfully delegated, rests upon identical principles. In this connection it may be said that while an emergency may enlarge or multiply the conditions with which the legislature may deal in the exercise of the police power as held in *Home Bldg. & Loan Asso. v. Blaisdell,* 290 U. S. 398, 54 Sup. Ct. 231, emergency in no manner affects the delegability of legislative power either by the congress or by the legislature of a state. The field over which the police power may be exerted is enlarged by an emergency because of changed social and economic conditions which warrant the exercise of that power at a given point in time. These considerations, however, have no effect upon the power of a legislature to delegate a power vested in it by a constitution, whether the legislative body be state or national.

After the decision of the *Gibson Auto Co. v. Finnegan Case, supra,* the legislature which was then in session proceeded to amend ch. 110, Stats. 1933, by the enactment of ch. 182, Laws of 1935. Ch. 182 was approved by the governor on June 22, 1935, and published on June 25, 1935. It amended and re-enacted ch. 110 as already indicated.

On May 27, 1935, the supreme court of the United States decided the case of *A. L. A. Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 Sup. Ct. 837, 79 L. Ed. 1570. In the opinion in that case the court determined, among other things, that in accordance with the principles laid down in *Panama Refining Co. v. Ryan,* 293 U. S. 388,

55 Sup. Ct. 241, the National Industrial Recovery Act was invalid because congress had attempted to delegate the authority to make codes for the government of trades and industries by or with the approval of the President of the United States without setting up any standard aside from the statement of the general aim of rehabilitation, correction, and development of trades and industries. In the course of that opinion the court again dealt with the whole matter of the delegation of legislative power by congress to executive or administrative agencies. Referring to sec. 3 of the National Industrial Recovery Act (15 USCA, § 703), the court said:

"[It] is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure.

"Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section 1.

"In view of the scope of that broad declaration and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered.

"We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power."

We must assume that in so vital and important a matter as the re-enactment of ch. 110, the legislature had before it not only the decision of this court in the *Gibson Case,* but the decision of the United States supreme court in the *Schechter Case,* which was published some time before the passage of ch. 182, Laws of 1935. In the *Gibson Case,* the defect pointed out was that the power to declare whether or not there should be a law was vested in the preponderant ma-

jority of a trade or industry. Such a power could not be delegated and therefore the act was void. It is quite evident that the legislature met this situation in ch. 182, Laws of 1935, by making it the duty of the governor—

"to investigate, ascertain, declare and prescribe reasonable codes or standards of fair competition and trade practices for the various trades and industries in the state."

The legislature denounced unfair methods of competition in business and unfair trade practices in business, and imposed upon the governor the duty of prescribing a code in such industries as upon investigation he found it necessary to accomplish the declared legislative purpose. Under ch. 110, Stats. 1935, initiative is no longer with either the preponderant majority of the industry or the governor. Therefore, the defect pointed out in ch. 110, Stats. 1933, is not contained in ch. 110, Stats. 1935.

We must also assume that in the light of the decision of the United States supreme court in the *Schechter Case,* the legislature intended to provide the requisite and necessary standard to guide the governor in the exercise of the power conferred upon him. In that case the court said:

"We pointed out in the *Panama Refining Co. Case* that the constitution has never been regarded as denying to congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.

"But we said that the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained."

The court went on to consider whether the language of the National Industrial Recovery Act furnished the requisite standard. The power conferred by that act upon the President was—

"to approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds" certain things.

The court then examined the meaning of the term "fair competition" for the purpose of discovering whether or not that term embodied any workable standard. The court pointed out that while "unfair methods of competition" is a phrase which has a well-understood and well-defined meaning in the law, the term "fair competition" was not antithetical to it and held that—

"the authority sought to be conferred by section 3 was not merely to deal with 'unfair competitive practices' which offend against existing law, and could be the subject of judicial condemnation without further legislation, or to create administrative machinery for the application of established principles of law to particular instances of violation. Rather, the purpose is clearly disclosed to authorize new and controlling prohibitions through codes of laws which would embrace what the formulators would propose, and what the President would approve or prescribe, as wise and beneficent measures for the government of trades and industries in order to bring about their rehabilitation, correction, and development, according to the general declaration of policy in section 1."

Having before us this decision, we turn to ch. 182, Laws of 1935, to discover whether or not the legislature has established a standard and, if so, what it is.

Sec. 110.04 (1) (a) "Methods of competition in business and trade practices shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited. The governor is hereby vested with the

power and jurisdiction and it shall be his duty to investigate, ascertain, declare and prescribe reasonable codes or standards of fair competition and trade practices for the various trades and industries in the state," etc.

It cannot be assumed that the legislature intended to fly in the face of the decision in the *Schechter Case,* and declare that the power to prescribe a code or standard of fair competition and trade practices was a sufficient standard. The United States supreme court had specifically condemned that as a standard because it afforded no reasonable limitation upon the exercise of the lawmaking power conferred upon the President. It permitted the President to make law at will so long as the law promoted the general policies of the act as enumerated in sec. 1 of N. I. R. A. (15 USCA, § 701), of which sec. 110.01 is substantially a copy. This the supreme court of the United States held to be no standard at all. In this respect the concurring opinion of Mr. Justice CARDOZO in the *Schechter Case* is enlightening:

"Here, in the case before us, is an attempted delegation not confined to any single act nor to any class or group of acts identified or described by reference to a standard. Here in effect is a roving commission to inquire into evils and upon discovery to correct them.

"I have said that there is no standard, definite or even approximate, to which legislation must conform. Let me make my meaning more precise. If codes of fair competition are codes eliminating 'unfair' methods of competition ascertained upon inquiry to prevail in one industry or another, there is no unlawful delegation of legislative functions when the President is directed to inquire into such practices and denounce them when discovered. . . .

"But there is another conception of codes of fair competition, their significance and function, which leads to very different consequences, though it is one that is struggling now for recognition and acceptance.

"By this other conception a code is not to be restricted to the elimination of business practices that would be characterized by general acceptance as oppressive or unfair. It is to

include whatever ordinances may be desirable or helpful for the well-being or prosperity of the industry affected.

"In that view, the function of its adoption is not merely negative, but positive; the planning of improvements as well as the extirpation of abuses. What is fair, as thus conceived, is not something to be contrasted with what is unfair or fraudulent or tricky. The extension becomes as wide as the field of industrial regulation.

"If that conception shall prevail, anything that congress may do within the limits of the commerce clause for the betterment of business may be done by the President upon the recommendation of a trade association by calling it a code.

"This is delegation running riot. No such plenitude of power is susceptible of transfer."

We should be obliged to assume either that the legislature did not consider the decision in the *Schechter Case* or that it proceeded in wilful disregard of it if by the enactment of sub. (1) (a) of sec. 110.04 it intended to declare that the making of a reasonable code or standard of fair competition or trade practices for the various trades and industries in the state was a sufficient standard to enable the governor in the exercise of the power conferred to fill up the details and to make public regulations interpreting the statute and directing the details of its execution as indicated in *State ex rel. Wis. Inspection Bureau v. Whitman,* 196 Wis. 472, 220 N. W. 929. We shall make no such assumption, but on the contrary assume that the legislature intended in the light of these decisions to lay down a definite standard, not one that had been condemned by the highest court in the land. We find that the standard laid down is embodied in these words— "unfair methods of competition in business and unfair trade practices in business are hereby prohibited." In construing the act of which this sentence is a part, we must, therefore, in conformity with what has been said, construe it in such a manner as to make it a valid enactment if that is reasonably

possible. The power to prescribe a code or a standard of fair competition is the power to eliminate unfair methods of competition in business and unfair trade practices in business. This is the standard upon which the governor must proceed in investigating, ascertaining, declaring, and prescribing rules and regulations whether they be denominated rules and regulations or a code. We are aided in reaching this conclusion by the provision contained in the separability clause found in sec. 110.10 of the act (ch. 182, Laws of 1935), which is very broad.

It cannot be assumed that the legislature having before it the decision in the *Schechter Case,* intended to give the governor "a roving commission to inquire into evils and upon discovery to correct them."

The conclusion at which we have arrived is not an unreasonable one if we analyze the effect of an exercise of the power which we hold to be conferred. Methods of competition in business and trade practices are divided by the act into two classes—those which are fair and those which are unfair. If from the whole body of methods of competition in business and trade practices we eliminate those which are unfair, those which remain are fair methods of competition and fair trade practices. There is a vast and fundamental difference between the power to make a rule and regulation which will eliminate an unfair trade practice or unfair method of competition in business, discovered upon investigation, and the power to prescribe a code of fair competition. This difference is adverted to in the *Schechter Case.* For the reason that the provisions of ch. 182, Laws of 1935, indicate that the importance of this distinction was not realized by the framers of that act, we shall endeavor to point it out more specifically. An unfair trade practice is difficult of definition, but the legal content of the term is well understood. For illustration, see Bituminous Coal Conservation Act of 1935

(Guffey Act, § 4, part 2 (i), 15 USCA, § 807 (i)). A rule or regulation whether in the affirmative or negative may eliminate such a practice. However, there may be many parallel fair methods of competition and many parallel fair trade practices. Suppose in a particular respect there are a dozen. The power to choose one among these fair trade practices and fair methods of competition and require conformity to that practice or method and so denounce all others as unfair is to exercise the kind of legislative power that may not be delegated because there is no standard which governs the action of the administrative agency in making its choice. When it picks out one method or practice from a group of fair methods and fair practices, it exercises pure legislative discretion. That particular method or practice so chosen cannot be discovered by any process of fact-finding.

It may be argued that the power to prescribe a code of methods of fair competition and fair trade practices is no broader than the power conferred upon the industrial commission under the safe-place statute. (Sec. 101.06, 101.10 (3), (4), (5).) This contention would be true if the safe-place statute were so construed as to authorize the industrial commission to prescribe what particular machine should be used by a manufacturer in his plant. A manufacturer may use such machine as he chooses, provided it is equipped with such guards and devices as are necessary to make it as safe as the nature of the employment will reasonably permit. The commission does not undertake to specify what particular kind of machine shall be used, which would be equivalent to specifying which particular method of competition or trade practice should be conformed to. By prescribing a code, the governor has the power to denounce an unfair method of competition or an unfair trade practice, which is equivalent to the power exercised by the industrial commission to require gears to be guarded and safety devices to be employed.

If, in order to eliminate unfair methods or practices in a particular trade or industry, it is necessary to establish by rule a standard of practice with which all members of the industry shall be required to comply, clearly that may be done. On the other hand, it cannot be held that the act confers upon the governor, in the exercise of the power conferred, power to do all that the legislature might do in promoting matters of general public policy. Any power that the governor may exercise in that regard must relate itself reasonably to the elimination of unfair competition in business and unfair trade practices, which are denounced by the act. By way of illustration, neither the governor nor the code administrator can proceed under this act to deal with the whole subject of establishing maximum hours of labor, minimum rates paid, and working conditions not related to the matter of unfair trade practices and unfair methods of competition. Any regulation made under the provision of this chapter in relation to those subjects must, as already stated, bear a reasonable relation to the elimination of unfair methods of competition in business and unfair methods of trade practices in order to conform to the standard prescribed by the act. What is unfair is one thing; what is in the interest of the industry or the general welfare is quite another thing.

This limitation does not apply to the provision that every code shall contain conditions prescribed by the statute, (a) relating to the right of employees to organize and bargain; (b) that no employee shall be required to join a company union. These are prescribed by the legislature itself and made a part of every code in the same way and to the same extent as provisions relating to standard policies of fire insurance are made parts of every contract of fire insurance.

It is urged that the provisions of sec. 110.02, by which it is provided that the chapter shall cease to be in effect on July 25, 1937, unless the governor shall sooner by procla-

mation declare that the emergency recognized by sec. 110.01 is ended, and that all codes approved or adopted shall remain in effect unless sooner terminated by the governor pursuant to the provisions of the chapter are unlawful delegation of power to the governor. The finding that the emergency no longer exists is a finding of fact, upon the making and promulgation of which the chapter by its terms ceases to operate; that such a power may be conferred upon the governor or any administrative agency seems to be too well established to require discussion. That the governor is given power to revoke or terminate a code which he is authorized to declare and prescribe is one which may constitutionally be conferred upon the governor. It is equivalent to the power of the industrial commission to make and repeal safety orders or substitute new orders in the place of existing orders. We are unable to discover any sound reason for holding that the conferring of such a power is an unauthorized delegation of legislative power.

It should be said here in order to avoid confusion that, however broad the language of the act may be with respect to any power or authority conferred upon the governor or upon any agency created by him, that power is limited and restricted by the standard set up in the act—that is, that anything done under the act must have a reasonable discoverable relation to the standard set up in the act and that there is "no plenitude of power" allowing either the governor or the agencies created by him to deal with the subjects mentioned and referred to in the act in a broad and comprehensive way, in the interest of the general welfare, as the legislature itself might do. The language of the act is confusing because a considerable part of it was copied from the National Industrial Recovery Act now declared invalid, much of it was not modified to conform to the standard set up by the act iself, and some of the terms employed lack definite legal content. It is not sufficient for the legislature to open the door by pre-

scribing a standard, and having thus brought the power conferred within the field of delegable power, thereafter enlarge it by intendment and construction beyond constitutional limits. The standard is a restriction and restraint which marks the extent of the power delegated, and it cannot by any process of reasoning be made a vehicle for the transfer of unlimited power in any respect.

The court assumed jurisdiction of this case upon the petition for the purpose of determining one question and one only, and that is, whether the act was invalid because of an unconstitutional delegation of legislative power to the governor and the agencies to be created by him. It is apparent that many other questions not dealt with in this opinion may be raised under this act. It may be so administered that in its administration it cannot be upheld on constitutional grounds. In declaring the act valid, in the respects considered, we pass upon no other questions than those dealt with, and shall postpone any determination in regard to collateral matters or questions arising under the administration of the act until those questions are properly presented in a remedial action as provided in sec. 110.04 (4) of the act (ch. 182, Laws of 1935).

As pointed out in *In re Exercise of Original Jurisdiction*, 201 Wis. 123, 229 N. W. 643, this court will with great reluctance take jurisdiction of matters which require an investigation and presentation of facts. The court has always taken a more liberal attitude in respect to matters presenting only questions of law. Manifestly, the consideration of codes prescribed for the various industries must involve a knowledge of intricate and involved matters of fact of which this court and perhaps no court can be assumed to have accurate knowledge. See Denman, Comment on Trials of Fact in Constitutional Cases, XXI A. B. A. Journal, p. 805. Many of the facts urged upon our attention in briefs by friends of the court have for that reason not been considered. It may

well be that such codes as have been adopted may require some revision in the light of the determination made in this case. All questions relating to such matters will be considered when properly presented.

*By the Court.*—For the reasons stated and in the respects considered in the foregoing opinion, it is adjudged and declared that the power conferred upon the governor to eliminate unfair methods of competition in business and unfair trade practices does not constitute an unconstitutional delegation of legislative power to the governor and the administrative agencies to be created by him, and that the act is valid in the respects considered.