STATE, Appellant, vs. NEVEAU, Respondent.

*October 11, 1940—March 11, 1941.*

86

90

94

For the appellant there were briefs by *Fred M. Wylie,* and oral argument by *Mr. Wylie, Mr. George F. Lange,* and

*Mr. Ralf T. Runge,* all of Madison. *Crownhart & Murphy* of Madison of counsel on the brief on motion for rehearing.

For the respondent there was a brief by *Galin & Jacobson* of Milwaukee, attorneys, and *Benjamin P. Galin* and *Max D. Wiviott,* both of Milwaukee, *Lloyd D. Mitchell* and *Laus & Cook,* all of Oshkosh, *A. Walter Dahl* of Superior, and *Edward S. Grodin* and *Lester H. Gunsberg,* both of Milwaukee, of counsel, and oral argument by *Mr. Galin* and *Mr. Leonard J. Cook. Galin & Jacobson* on the brief on motion for rehearing.

The following opinion was filed November 20, 1940 :

ROSENBERRY, C. J.   A perfect swarm of constitutional questions is raised by a consideration of the facts and conclusions in this case.   To deal exhaustively with all of the questions raised and suggested would require us to write a treatise on constitutional law.   In the first place, it is to be observed that sec. 100.205, Stats. 1939, presents a peculiar method of lawmaking.   There are included in the statute many provisions as to the constitutionality of which the legislature must have had substantial doubts.   This is indicated by the fact that the legislature went to extreme lengths in the insertion of severability clauses in the act.   Sub. (7) is general, and by its terms the provisions and limitations of sec. 100.205 wherever contained in the act and whether express or implied, are all severable from each other and as to different persons, things, and circumstances.   This, of course, applies to sub. (6) (a), but in order to make assurance doubly sure sub. (6) (a) provides: "Each provision of this paragraph is expressly declared to be severable."

It was apparently the legislative purpose to enact a law as to the constitutionality of which there was substantial doubt, and then, by the insertion of an all-inclusive severability clause, authorize the court to whittle down the law so as to bring it within the constitutional field.   This is a method of

lawmaking not contemplated by the constitution. The constitutional mandates apply to the legislature as well as the courts. It is as much the responsibility of the legislature to enact valid laws as it is the duty of the courts to pass upon their validity after they are enacted.

There is considerable argument in the briefs as to the right of the defendant to attack the statute and "standards" on the ground that they are unconstitutional. This question arises because of the fact that this court, in common with many other courts, has held that one who accepts the benefit of a law waives the right to question the constitutionality of the law. That doctrine has no application to the facts of this case. The defendant did not accept the law, he did not commence this action pursuant to the provisions of the law. When the plaintiff sought to enforce the act by invoking the equity jurisdiction of the circuit court, the defendant was entitled to put forward any and all defenses which he had, including that of the invalidity of the act. As to that there can be no reasonable doubt.

The same thing is true with respect to the so-called standards promulgated pursuant to the terms of the act where such standards appear to be invalid upon their face and do not deal with factual situations, resting upon testimony taken during the course of formulating code standards. At this point it may be remarked that the word "standards," as used in sec. 100.205, Stats. 1939, is not used in its customary and usual sense. "Standards" apparently comprehends what is ordinarily denominated a rule or order which results in the use of a "standard" to promulgate a standard.

We shall first consider sub. (6) (a). There are in the state twenty-four counties of over 30,000 population, which contain cities with a population of over 5,200; five counties of 30,000 population or less containing cities of over 5,200; forty-two counties containing no cities of over 5,200. By the first sentence the legislature attempts to classify cities by way

of the population of the counties in which they are located. We see no conceivable basis upon which cities may be thus classified by counties. There are five cities, Ashland, 10,622, Antigo, 8,610, Merrill, 8,458, Rhinelander, 8,019, and Menomonie, 5,595, situated in counties of less than 30,000 population. The business of barbering in these cities is no different from the business of barbering in like cities in more populous counties.

An attempt is made to justify the classification on the ground that these cities are at considerable distances from any of the larger cities of the state, but we do not see what distance has to do with the regulation of the barber business. The business is carried on in the cities. People do not ordinarily travel from one city to another to have their hair cut or procure other services in a barbershop. We need not again state the basis of a proper classification. It has been stated over and over again. See *State ex rel. Ford Hopkins Co. v. Mayor* (1937), 226 Wis. 215, 276 N. W. 311, and cases cited.

It is considered therefore that the classification of cities by counties fails to conform to constitutional requirements, but by the express terms of the act this provision is severable.

In the event that the provision in regard to counties is found to be invalid, the act provides :

"The provision shall be that standards are *prima facie* not necessary or convenient in any county of not more than thirty thousand population," etc.

This is a clear attempt to classify by presumption and to do indirectly what cannot be done directly. It requires no argument to show that an artificial presumption does not dispense with the necessity of a valid classification where a law is designed to operate unequally upon the inhabitants of the state.

We are then directed, under the terms of the act, to consider the validity of the classification of towns, cities, or

villages having a population of 5,200 or less. We are not required under the law to find a proper basis of classification, but the classification made by the legislature is presumed to be valid unless the court can say that no state of facts can reasonably be conceived that would sustain it. All reasonable doubts must be resolved in favor of the legislative classification. *Servonitz v. State* (1907), 133 Wis. 231, 113 N. W. 277.

We are not able to say that the legislature had no conceivably reasonable basis for this classification, hence the classification by towns, cities, and villages by population must stand. That part of the second proviso relating to towns, cities, and villages does not apply by its terms because that classification is held to be valid.

This brings us to a consideration of the third proviso of the act:

"Provided that in any event no standards shall be effective in any such county or in any such town, city or village other than those in a county having a population of five hundred thousand or more unless such standards are approved by a majority of the electors voting thereon in such county or town, city or village."

On behalf of the state it is argued that the electoral provision just quoted is attached to the next preceding proviso and not to the main provisions in the first sentence of the paragraph and relates only to counties of less than 30,000 and towns, cities, and villages of less than 5,200 population. We are at a loss to understand upon what basis this contention can be made. It is said in the brief:

"The code is in effect in all towns, cities and villages of more than 5,200 in counties of more than 30,000 without any election; only if the first sentence of paragraph (a) of subsection (6) is invalid does the election feature come in at all, and then it comes in as to counties of less than 30,000 and towns, cities and villages of less than 5,200 and here the distinction is made and here only that in such event no elec-

tion shall be necessary in the towns, villages and cities of less than 5,200 in counties of more than 500,000 population."

However, it is held that the first sentence of the subsection is not invalid as a whole but only that part of it relating to counties and the classification as to towns, cities, and villages is valid. Rewriting the section with the invalid and inapplicable provision eliminated, we have the following:

"(a) The provisions of this section shall not apply to any town, city or village having a population of 5,200 or less by such census. Provided that in any event no standards shall be effective in any such town, city or village other than those in the counties having a population of 500,000 or more unless such standards shall be approved by a majority of the electors voting thereon."

Sub. (6) (a) is in its entirety a proviso. Were it not for this subsection the act would apply to the state as a whole and to every part of it. If the words "such town, city or village" in the electoral proviso refer to the language of the second proviso and therefore refer to towns, cities and villages having a population of less than 5,200, they are already excluded from the act because not within the first sentence of par. (a), after the elimination of the provision in regard to counties therefrom. We discover no basis upon which cities may be so classified. For the purpose of this proviso cities are divided into two classes, those in counties having a population of 500,000 or more and those in counties having a population of 30,000 or less. If applicable, the electoral provision would be invalid because not based upon a classification germane to the act. So whether it be eliminated because not applicable or eliminated because invalid, it does not apply to the valid part of the first provision. Eliminating the electoral provision of par. (a) we have remaining as valid the provision that the act shall not apply to towns, cities and villages having a population of 5,200 or less. As already

stated, this classification is held to be valid and while an argument can be made that a consideration of all the terms of the subsection lead to the conclusion that the legislature did not intend to apply it to towns, cities and villages in counties having a population of less than 30,000, that inference is overcome by the terms of the severability clause.

While numerous other questions are raised and suggested, it is considered that we should discuss only such further questions as are necessary to a disposition of this case and leave other questions to be considered when they arise in subsequent cases for the reason that it appears probable that they will not again be presented in the form in which they appear in this case.

In *Petition of State ex rel. Attorney General* (1936), 220 Wis. 25, 264 N. W. 633, we sustained the constitutionality of ch. 110, Stats. 1935. A similar law under the same chapter number enacted in 1933 had been declared invalid in *Gibson Auto Co. v. Finnegan* (1935), 217 Wis. 401, 259 N. W. 420. Ch. 110, Stats. 1933, had been declared invalid because it was an attempt to delegate the power of the legislature to determine whether there should be a code to a preponderant majority of an unascertained group. In the course of the opinion it was said (p. 408) :

"The act under consideration here attempts to do precisely what it was said in *State ex rel. Wisconsin Inspection Bureau v. Whitman, supra,* the legislature may not constitutionally do; that is, delegate the power to declare whether or not there shall be a law. Under this statute, that declaration is left to the preponderant majority of the trade. The act does not even declare unfair competitive practices illegal."

That law provided for the promulgation of codes of fair competition and business practices. It did not in terms denounce unfair competition and unfair business practices.

Ch. 110, Stats. 1935, provided:

"Methods of competition in business and trade practices shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited." (Sec. 110.04 (1) (a).)

In sustaining the validity of this act against attack on the ground that it constituted an improper delegation of the legislative power, the court said (*Petition of State ex rel. Attorney General, supra,* p. 39):

"We find that the standard laid down is embodied in these words—'unfair methods of competition in business and unfair trade practices in business are hereby prohibited.' In construing the act of which this sentence is a part, we must, therefore, in conformity with what has been said, construe it in such a manner as to make it a valid enactment if that is reasonably possible. The power to prescribe a code or a standard of fair competition is the power to eliminate unfair methods of competition in business and unfair trade practices in business. This is the standard upon which the governor must proceed in investigating, ascertaining, declaring, and prescribing rules and regulations whether they be denominated rules and regulations or a code. . . .

"The conclusion at which we have arrived is not an unreasonable one if we analyze the effect of an exercise of the power which we hold to be conferred. Methods of competition in business and trade practices are divided by the act into two classes—those which are fair and those which are unfair. If from the whole body of methods of competition in business and trade practices we eliminate those which are unfair, those which remain are fair methods of competition and fair trade practices. There is a vast and fundamental difference between the power to make a rule and regulation which will eliminate an unfair trade practice or unfair method of competition in business, discovered upon investigation, and the power to prescribe a code of fair competition. . . . A rule or regulation whether in the affirmative or negative may eliminate such a practice. However, there may be many parallel fair methods of competition and many parallel fair trade practices. Suppose in a particular respect there are a dozen. The power to

choose one among these fair trade practices and fair methods of competition and require conformity to that practice or method and so denounce all others as unfair is to exercise the kind of legislative power that may not be delegated because there is no standard which governs the action of the administrative agency in making its choice. When it picks out one method or practice from a group of fair methods and fair practices, it exercises pure legislative discretion. That particular method or practice so chosen cannot be discovered by any process of fact-finding. . . .

"If, in order to eliminate unfair methods or practices in a particular trade or industry, it is necessary to establish by rule a standard of practice with which all members of the industry shall be required to comply, clearly that may be done. *On the other hand, it cannot be held that the act confers upon the governor, in the exercise of the power conferred, power to do all that the legislature might do in promoting matters of general public policy. Any power that the governor may exercise in that regard must relate itself reasonably to the elimination of unfair competition in business and unfair trade practices, which are denounced by the act.* . . . Any regulation made under the provision of this chapter in relation to those subjects must, as already stated, bear a reasonable relation to the elimination of unfair methods of competition in business and unfair methods of trade practices in order to conform to the standard prescribed by the act. What is unfair is one thing; what is in the interest of the industry or the general welfare is quite another thing."

As already stated, sec. 100.205 (3) (a), Stats. 1939, declares—

"unreasonably low wages, unreasonably long or inappropriate work or shop hours, other unreasonably burdensome or hazardous labor conditions, and selling below reasonable cost, are severally expressly declared to be, among others, unfair methods and practices"—

and the examiner is authorized in sub. (1) (a) to—

"issue by order such standards, with written reasons therefor, as are necessary or convenient to eliminate unfair methods of competition or unfair trade practices" in the several trades.

Pursuant to this authority the examiner promulgated standards for the barber trade which are set out in full in the margin.[1]

Under the act any violation of one of the so-called standards is punishable by a fine of not less than five nor more than

[1](Changes are in secs. 8 and 21)                    March '40

STATE OF WISCONSIN
TRADE PRACTICE STANDARDS
FOR THE
BARBER TRADE

To eliminate unfair methods of competition and unfair trade practices in the barber trade, these trade-practice standards are issued under section 100.205 of the statutes.

*Definitions:*

1. "Barbering," "barbershop," "shop manager," "barber," "journeyman barber," and "apprentice barber," are as defined in the barber's license law, chapter 158 of the statutes.

2. The "barber trade" is the business of barbering.

3. "Member of the trade" is anyone engaged therein as the owner or shop manager of such business.

4. "Division" is the trade-practice division of the state department of agriculture.

*Exceptions:*

5. These standards shall not apply to employees of a state, county, or municipal institution serving only its inmates.

*Minimum Rates of Pay:*

6. The minimum rates of journeyman's pay, upon whatever basis computed, and in addition to tips and gratuities and to supplies and laundry other than of personal uniforms, are:

(1) Full-time: Per week of 48 hours, $17 plus 60 per cent of gross receipts from his services over $26. Violation of the reasonable cost schedule of these standards does not authorize the use of prices below such schedule in computing "gross receipts."

(2) Part-time: (a) For Saturdays and days before the holidays named in section 17, $5 per day plus 65 per cent of gross receipts from his services over $7; (b) for other days, 50 cents per hour or 65 per cent of gross receipts from his services, at his option; (c) when consistently employed for both, the greater of 40 cents per hour or 65 per cent of gross receipts from his services.

(3) Overtime: For time over 48 hours in any one calendar week, 50 cents per hour, plus inclusion of receipts in computing commission.

7. Apprentices shall be paid in accordance with regulations of the industrial commission.

8. Wages shall be paid at least once a week, within 15 days of the end of the period, in currency or negotiable check, and without fine, rebate, charge, or deduction unless otherwise authorized or re-

one hundred dollars, or by imprisonment in the county jail for not less than five nor more than ninety days, or both, so that the so-called trade-practice standards are in fact orders having the force and effect of law and for the violation of which the offender may be fined and imprisoned.

quired by law or labor contract or in writing by the employee. This does not permit a rate of pay below the minimum.

*Maximum Hours:*

9. No employee doing barbering shall work more than 54 hours in any calendar week.

10. Barbers operating one-chair shops may work the full number of aggregate shop hours.

11. All barbers may finish serving patrons who are in the shop at closing time.

12. Hours of labor shall be consecutive, except for regular meal periods.

13. Work in this or any other trade or of any kind, for any employer or by contract, when known to the member of this trade, is part of these maxima.

14. The hours between the first opening and final closing of a shop each day must be consecutive and shall not aggregate more than 62 hours in any calendar week.

15. Shops may not open before 7 a. m. and may not close later than 7 p. m., except that shops may be open on nights before Sundays and before holidays and one additional night each week.

16. Schedule of opening and closing hours, based on correct central standard time, shall be posted in each shop and a copy thereof shall be filed with the division. The schedule of opening and closing hours may be changed upon giving 30 days' notice to the division.

17. Shops shall be closed on Sundays, on January 1, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day, except when these holidays fall on Saturday.

18. A barbershop located in a hotel building, regularly charging at least twenty per cent (20%) or more above the minimum prices (reasonable costs) provided under these standards, conspicuously displaying a sign reading "Services on Sundays limited to hotel guests," in which such services are not knowingly performed for other than registered guests of the hotel located in said building, and in which other provisions of these standards are complied with, may open not earlier than 7 a. m. and close not later than 7:30 p. m. on week days, and may be operated on Sundays between the hours of 9 a. m. and 12 noon, the hours of shop operation not to exceed 78½ hours in any one week.

*Other Labor Practices:*

19. No employee shall be misclassified so as to evade any provision of these standards.

A mere inspection of the trade-practice standards for the barber trade discloses that it is a complete, comprehensive, and detailed regulation of the barbering business. It fixes prices, it fixes prices of labor, it does everything, perhaps more, than the legislature itself could do in regulating the

20. No employee shall be discharged or demoted for complaining of an alleged violation of these standards, nor for giving evidence relative thereto.

21. Only one part-time barber may work in a barbershop except as a part-time barber temporarily takes the place of a full-time barber.

22. Hours and rates of pay include all the time the employee is requested or permitted by the employer to be on duty at the shop or elsewhere.

23. Each member of the trade shall keep daily record of each employee's actual beginning, quitting, and mealtime, and gross receipts, and weekly record of wages paid.

24. These wage, hour, and other labor standards are not intended to lower or lessen any other requirement of law, regulation, or contract.

25. A person physically or mentally handicapped by age or other infirmity may be employed at light work for such hours and wages when and as authorized by the industrial commission. A statement of the employment of such a person, giving occupation, wages and hours, and of change or termination thereof, shall be filed with the division by the employer.

*Reasonable Costs:*

26. Barbering shall not be done for less than the following reasonable costs:

| | | | |
|---|---|---|---|
| Haircut | $.50 | Hand and vibrator massage | $.75 |
| Haircut, children under 12 years | .40 | Mud pack | .75 |
| Shave | .25 | Witch-hazel steam | .25 |
| Beard trim | .35 | Hair-tonic application | .25 |
| Plain shampoo | .40 | Ladies' neck clip | .25 |
| Hand massage | .50 | Razor honing | .50 |
| Vibrator massage | .50 | | |

*Other Practices:*

27. Also each of the following is an unfair method of competition and an unfair trade practice, and is forbidden:

(1) To offer, contract, undertake, or advertise to do or sell, or to do or sell, barbering for less than the foregoing scheduled reasonable cost, directly or indirectly, by:

(a) Free services, except to *bona fide* charities.

(b) A mala-fide partial payment or credit system.

(c) Combination of services for less than the total of the charges regularly made when done singly.

industry in the interest of the general welfare. It is considered that it attempts to exercise a power which it was distinctly and definitely held in *Petition of State ex rel. Attorney General, supra,* could not be delegated. It requires no argument to demonstrate this. We make reference, how-

(d) Giving premiums, prizes, or anything of value.

(e) Use of supplies furnished by a customer.

(f) A mala-fide co-operative.

(g) Any method or device.

(2) Secret payment or allowance of rebate, refund, remission of past indebtedness, commission, or discount, whether in the form of money or otherwise, including the extension to a particular customer of special service or privilege.

(3) False or misleading advertising, or misrepresentation of goods or quality of material or service.

(4) A mala-fide partnership in or lease of a shop or a chair in such manner as to defeat any provision of these standards.

(5) To permit a barber to work or to permit self-service in a shop in closed hours.

*License Fees:*

28. Each member of the trade is assessed and shall pay the following annual license fee: For each shop, $7.50 for the first chair plus $5 for each additional chair in actual use whole or part time.

*Administration:*

29. The division shall have access to all places and records necessary to enable investigation of all pertinent matters, and may require such records and reports as it deems necessary or convenient.

30. Any person aggrieved by any provision of these standards, the time to appeal to the department having expired, may apply to the examiner, specifically setting forth his grievance and demanded relief, and thereupon, if within a reasonable time previously the petitioner has not had opportunity to be heard and if the matter be relevant, material, and substantial, shall be given opportunity to be heard, following which the examiner shall determine the matter by the entry or denial of an order.

31. Upon notice and hearing, the examiner may determine the fact of violation of section 100.205 or of these standards and issue an order to cease and desist. This is not intended to exclude other remedies.

32. Towns, villages and cities of more than 5,200 population situated in counties of more than 30,000 population (both by the last federal census), except the cities of Beaver Dam, Marshfield, and Portage, are the code areas.

33. These standards supersede previously issued standards and are effective upon publication, but sections 6 to 27, inclusive, are not enforceable until March 1, 1940.

ever, to paragraph 26, which provides that barbering shall not be done for less than the following reasonable costs: Haircut, $.50; shave, $.25.

It is a matter of common knowledge that these are not in the trade the minimum but the maximum prices charged generally for such services. It is considered that it is beyond the power of the legislature to delegate authority to an administrative agency to determine that there can be in practical effect but one class of service in the barber trade. In many sections of the state two classes of service are offered, one which merely gives the essentials, the other, in addition to the essentials, gives a more elaborate service. Some people prefer one class of service and some another. A man going into a 35c-15c shop does not expect to get the same class of service he gets in a 50c-25c shop. We are unable to discover anything that approaches methods of unfair competition or unfair trade practices in the fact that one man runs a barbershop in which he charges 35c-15c for the service rendered and another man runs a shop in which he charges 50c-25c for the service he renders. When a customer enters a shop he is fully aware of the kind of service he will receive for the price at that shop. This provision of the code does not eliminate unfair trade practices or unfair methods of competition. It, in effect, declares that having two classes of service is detrimental to the general welfare. If that be true, that is a matter for the legislature. In this connection also the code attempts to establish reasonable costs,—reasonable costs of whom and where? Are the reasonable costs the same in all cities, towns, and villages? Obviously not. Is a barber in a rural town or suburban district to be fined because he sells

*Severability:*

34. Each provision of these standards, including exceptions and limitations, is severable from each other and as to each person, place, thing, and circumstance.

TRADE PRACTICE DIVISION
Washington Building
Madison, Wis.

service at a price less than it costs a barber in a large city or in a high-rental district? The code does not declare certain specific practices to be unfair and order persons furnishing barber services to cease and desist therefrom. The barber code is in effect a general law having all the characteristics of an act of the legislature itself. Assuming that the legislature itself could do all that is attempted to be done by the code, it certainly cannot delegate to an administrative agent authority to exercise its full power. As a whole, the code is invalid as an unwarranted exercise of legislative power which cannot be delegated.

We note that "standards" contain a severability clause. This is certainly carrying the doctrine of severability to an unwarrantable length. In this case we shall do no more than treat the code as a whole and make no attempt to create a new and different code by eliminating specific provisions. It is the duty of the administrative agent to act within his authority in promulgating a code. It is not the duty of the court to do more than declare whether or not the code as issued is valid or invalid. It should be apparent that the authority to eliminate unfair methods of competition and unfair trade practices is a very limited and special power. What the standards do is to attempt to eliminate unfair methods of competition by doing away with competition and standardizing the entire industry.

*By the Court.*—Judgment affirmed.

The following memorandum was filed March 11, 1941:

ROSENBERRY, C. J. (*on motion for rehearing*). Discussing the decision counsel say:

"The decision seems to be most definitely grounded on the code as a whole being so complete a regulation of the trade as to constitute an attempt to exercise the whole, or so nearly the whole, legislative power as to be beyond what can be delegated to an administrative agency."

Counsel for plaintiff seem to have no difficulty in stating the gist of the decision. We pointed out in the opinion in this case that the administrative had done exactly what it was said in *Petition of State ex rel. Attorney General* (1936), 220 Wis. 25, 264 N. W. 633, an administrative might not do. A reading of the trade-practice standards for the barber trade makes it perfectly obvious that what is being done is to regulate by affirmative action the whole barber business. If the argument made in support of plaintiff's motion for rehearing is sound, then there is no limit to administrative lawmaking. In form and in substance the so-called standards are a regulation of the business and not a mere elimination of unfair trade practices and unfair methods of competition. If the legislature may delegate to an individual or a group legislative power to do what the administrative did in this case, we have taken a long step in becoming a nation of licensees instead of a nation of freemen. We shall ultimately be dependent, practically if not legally, for the right to earn a livelihood upon the good will of some state or federal inspector. The so-called standards do not purport solely to regulate a business but apply equally to a regulation of an individual's conduct, and restrict the freedom of action of individuals in respects that have no relation to the elimination of unfair trade practices or unfair methods of competition.

Counsel assert that the decision in this case is inconsistent with that of the court in *State ex rel. Attorney General v. Fasekas* (1937), 223 Wis. 356, 269 N. W. 700. We discover no inconsistency. The cases proceed on entirely different grounds. The question here is not whether there is a valid exercise of a delegable power which was the issue in the *Fasekas Case*. Here there is an attempt to exercise a power which is not delegable, that is, in effect to exercise the whole legislative power with reference to the subject matter under consideration.

*By the Court.*—The motion for rehearing is denied, without costs.