STATE EX REL. ATTORNEY GENERAL, Respondent. vs.
FASEKAS, Appellant.

*October 16, 1936—January 12, 1937.*

*James J. Kerwin* of Milwaukee, for the appellant.

For the respondent there was a brief by the *Attorney General, Fred M. Wylie,* special counsel, *William A. Zabel,* district attorney of Milwaukee county, and *Arthur Schmidt,* assistant district attorney, and oral argument by *Mr. Wylie* and *Mr. C. J. Marsh* of Madison, counsel for the Trade Practice Commission.

The following opinion was filed November 10, 1936:

ROSENBERRY, C. J. The order and judgment of the court finding the defendant, Fasekas, guilty of contempt must be sustained on the authority of *State ex rel. Fowler v. Circuit Court* (1898), 98 Wis. 143, 73 N. W. 788, and *John F. Jelke Co. v. Beck* (1932), 208 Wis. 650, 242 N. W. 576. The defendant acted in entire disregard of the court's order, claiming that the code, under and pursuant to which the order was made, was invalid and unconstitutional. The defendant flouted the court and contumaciously refused to abide by an order made by a competent court having jurisdiction over his person and the subject matter of the controversy. Whether the order was right or wrong, it was the

duty of the defendant to obey it until relieved therefrom in some one of the ways prescribed by law.

By his demurrer to the complaint the defendant seeks to raise an issue regarding the constitutionality of the code of fair competition for the intrastate business of the barber industry. The code itself is not set out in the complaint nor are we referred in any way to a copy of the code. In as much as we do not in this case reach the question sought to be raised, we shall not attempt to take judicial notice of it. The code was framed under and pursuant to ch. 110, Stats. 1935, entitled, "Emergency Promotion of Industrial Recovery." Sec. 110.04 (4) provides:

"All orders of the governor prescribing, approving, disapproving, modifying, amending or terminating codes shall be subject to review in the same manner in which orders and awards of the industrial commission are made reviewable by subsections (1), (2) and (3) of section 102.23, and by sections 102.24 and 102.25 of the statutes, . . ."—

except that the word "governor" is substituted for the word "commission."

Sec. 102.23 of the Workmen's Compensation Act relating to judicial review provides that findings of fact made by the commission shall be conclusive if the commission acts within its power and without fraud. It further provides that an award or order of the industrial commission may be reviewed by commencing an action in the circuit court for Dane county for that purpose. The statute then provides:

"With its answer, the commission shall make return to said court of all documents and papers on file in the matter, and of all testimony which may have been taken therein, and of its order, findings and award. . . . Said action may thereupon be brought on for hearing before said court upon such record by either party on ten days' notice to the other," etc.

The section further provides that the award or order shall be set aside only upon the following grounds: (a) That

the commission acted without or in excess of its powers; (b) that the order or award was procured by fraud; (c) that the findings of fact by the commission do not support the order or award.

Sec. 102.24 relates to the remission of the record. Sec. 102.25 provides for an appeal from the judgment of the circuit court on the award to the supreme court.

The defendant sought no review of the order made by the governor establishing the code. Ch. 110, of the statutes of 1935, was held, when properly construed, to be constitutional. *Petition of State ex rel. Attorney General (Tavern Code Authority)* (1936), 220 Wis. 25, 264 N. W. 633. In the course of the opinion in that case the distinction between a code of fair competition and a code which merely eliminates unfair competition and unfair trade practice was clearly pointed out, and it was there said:

"By way of illustration, neither the governor nor the code administrator can proceed under this act to deal with the whole subject of establishing maximum hours of labor, minimum rates paid, and working conditions not related to the matter of unfair trade practices and unfair methods of competition. Any regulation made under the provisions of this chapter in relation to those subjects must, as already stated, bear a reasonable relation to the elimination of unfair methods of competition in business and unfair methods of trade practices in order to conform to the standard prescribed by the act. What is unfair is one thing; what is in the interest of the industry or the general welfare is quite another thing."

Sec. 110.04 (1) (a) provides: "The governor is hereby vested with the power and jurisdiction and it shall be his duty to investigate, ascertain, declare and prescribe reasonable codes or standards of fair competition and trade practices for the various trades and industries in the state. . . . Such codes or standards of fair competition and trade practices shall be prescribed and approved by the governor after such reasonable public notice and hearing as he shall specify

and if he finds (1) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them and will tend to effectuate the policy of this chapter, and (2) that such code or codes are not inequitable and that the interests· of the consumers and general public will be protected, and (3) that such code is necessary for the stabilization of the intrastate business of such trade or industry. . . ."

These provisions are limitations upon the power of the governor. In order to comply with the decision in the *Schechter Case* (*A. L. A. Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 Sup. Ct. 837), the court held in the *Tavern Code Authority Case* that a further consideration must be added, to wit: That the codes prescribed must have some reasonable relation to unfair methods of competition and unfair trade practices in business. These are the standards prescribed by the statute. Unless the provisions of the codes are so reasonably related to unfair methods of competition and unfair trade practices, the governor is without authority under the terms of the act.

No doubt the purpose of the legislature in prescribing that the order of the governor establishing a code could be reviewed only in the manner prescribed by sec. 110.04 (4) was to insure bringing before the court the record upon which the governor acted. There is nothing before us relating to the proceedings had before the governor or the record·made upon the hearing required to be held prior to the promulgation of the code. If the statutory procedure had been followed, and a review had been sought in accordance with the statute, that record would be before us, and from it a determination could be made as to whether the governor acted in excess of and beyond his jurisdiction. Without such a record it must be presumed that the governor proceeded in the manner prescribed by statute, made the necessary findings, and that such findings are properly supported by evidence

offered on the hearing. While sec. 102.23 limits the time for appeal to thirty days, we were advised upon the oral argument that a procedure has been laid down whereby any member of an industry adversely affected may have a review of the code at any time, and that the order so made may be brought before the court in the manner prescribed by statute.

Sec. 110.05 provides that the governor may modify or terminate any code or any specific provision thereof approved or issued under this chapter if he shall determine that such code or any specific provision thereof does not effectuate the purpose of this chapter. Each code approved under the provisions of this chapter shall contain an express provision to that effect.

In *Corstvet v. Bank of Deerfield* (1936), 220 Wis. 209, 263 N. W. 687, it was held that a dissenting stockholder who had not sought a review of the act of the commissioner of banking approving a stabilization agreement was concluded, and it was there said :

"It is a well-established principle of law that where a special tribunal is created by statute, charged with the duty and having the power to review the determination of an administrative agency, that tribunal must be first resorted to before resort is had to the courts." (Citing cases.)

It is an equally well-established rule of law that, where a new right is created or power conferred and a particular method of review is prescribed by the act creating the right or conferring the power, that method of review must be pursued. *In re Jeness* (1935), 218 Wis. 447, 261 N. W. 415.

While no separate tribunal is created by statute with power to review the order of the governor, the governor may review such an order upon petition or upon his own motion under the statute, so that a member of a particular industry operating under a code is not deprived of a means of a proper

review of any order affecting him in the exercise of his constitutional rights.

Requiring members of an industry who are dissatisfied with the provisions of a code, or who feel their rights are unwarrantably invaded thereby, to proceed in the manner provided by statute, does not deny them recourse to the courts. It merely requires them to assert their rights in the manner provided by statute. Any order establishing a code under the statute must be made pursuant to certain findings of fact. The order therefore deals with a factual situation which is not before the court in this case.

There are two possible grounds upon which it may be argued that the defendant's demurrer to the complaint should be sustained: (1) That under no conceivable circumstance can the matter of price either for service rendered or compensation paid, have any relation to unfair trade practices and unfair methods of competition; or (2) that, if such reasonable relation between price and compensation and unfair trade practices and unfair methods of competition be established, nevertheless the legislature of a state is without power to fix wages and prices.

After fully considering the case of *Morehead v. N. Y. ex rel. Tipaldo* (1936), 298 U. S. 587, 56 Sup. Ct. 918, 920, 80 L. Ed. 1347, it is considered that neither of these contentions is within the doctrine of that case. The supreme court of the United States did not have under consideration either in the *Morehead Case* or in *Adkins v. Children's Hospital* (1923), 261 U. S. 525, 43 Sup. Ct. 394, 400, upon which the decision in the *Morehead Case* is based, anything but the power of the state to fix wages. In the *Morehead Case* the court said:

"The act extends to women and minors in any 'occupation' which 'shall mean an industry, trade or business or branch thereof or class of work therein in which women or minors

are gainfully employed, but shall not include domestic serv-
ice in the home of the employer or labor on a farm.' . . . It
is not an emergency law. It does not regulate hours or any
conditions affecting safety or protection of employees. It
relates only to wages of adult women and minors."

The court further said: "The *Adkins Case,* unless distin-
guishable, requires affirmance of the judgment below. The
petition for the writ sought review upon the ground that this
case is distinguishable from that one. No application has
been made for reconsideration of the constitutional question
there decided. The validity of the principles upon which
that decision rests is not challenged. This court confines
itself to the ground upon which the writ was asked or
granted. . . . He is not entitled and does not ask to be heard
upon the question whether the *Adkins Case* should be over-
ruled. He maintains that it may be distinguished on the
ground that the statutes are vitally dissimilar."

While the *Morehead Case* affirms and follows the *Adkins
Case,* neither of these cases dealt with the matter of wage
and price in relation to matters which are concededly within
the power of the legislature to regulate. The matter was
considered wholly apart from such circumstances. The de-
cision in the *Morehead Case* was expressly limited by the
court to determination of whether there were any grounds
upon which it could be distinguished from the *Adkins Case.*

The elimination of unfair trade practices and unfair
methods of competition have for a long time been subjects
of state and national legislation. The power of the legisla-
ture to deal with these matters within the constitutional field
is well established. If it be shown that as a matter of fact
prices and wage are so intimately related to unfair trade
practices and unfair methods of competition in a particular
trade or industry that the matter can be dealt with adequately
in no other way than by fixing wages and prices, a situation
would be presented with which the supreme court of the
United States, so far as we are advised, has not yet been
called upon to consider. In view of that fact, any deter-

mination of the question should be deferred until the whole matter can be heard and considered in the light of the record upon which the executive order was based.

In the *Adkins Case, supra,* an attempt was made to support the law on the ground that the fixing of a minimum wage was necessary to protect the morals of women workers. The court found as a matter of fact that there was no relation between earnings and morals. The court said:

"Morality rests upon other considerations than wages; and there is, certainly, no such prevalent connection between the two as to justify a broad attempt to adjust the latter with reference to the former. As a means of safeguarding morals the attempted classification, in our opinion, is without reasonable basis."

In this case under the act as construed in the *Tavern Code Authority Case,* the governor is not authorized to fix wages generally, but only in those cases where it can be established as a matter of fact that the fixing of wages has a relation to the elimination of unfair trade practices and unfair methods of competition. Whether or not there is such relation is a question of fact which must be determined in the first instance by the governor. The finding cannot rest upon mere assertion; it must rest upon proof. If the relation cannot be established as a matter of fact, it was distinctly held in the *Tavern Code Authority Case* that the act conferred no power to fix wages and prices.

The United States supreme court in the *Morehead Case* also called attention to the fact that the act there under consideration was not an emergency measure. It does not indicate what effect, if any, that fact would have upon its determination. We call attention to this distinction so that it may be properly considered when the matter is again presented here.

*By the Court.*—The orders appealed from are affirmed.

FOWLER, J. (*dissenting*). I agree with the decision of the court affirming the order of the circuit court committing the appellant for contempt, but I cannot agree with its action in affirming the order overruling the demurrer to the complaint on the ground of the insufficiency of the facts stated therein to constitute a cause of action.

The complaint alleges that the barber's code promulgated by the governor of the state fixes the "minimum wages" that a barber may pay his workmen. This provision denies the defendant the right to contract with his workmen for a compensation less than that fixed by the code. The objection made to the complaint in support of the demurrer is that the Fourteenth amendment to the constitution of the United States prohibits a state from enacting any statute that deprives a person of his liberty without due process. Deprivation of liberty to contract is deprivation of liberty within this rule under the interpretation of that term in that amendment given by the supreme court of the United States.

This court is bound by a decision of the supreme court of the United States interpreting a provision of the United States constitution, whether we like it or not. Until such a decision is overruled by that court, this court cannot, under the judicial oath of its members to support the constitution of the United States, either disobey or ignore it in deciding a case to which the provision interpreted applies.

The supreme court of the United States in the recent case of *Morehead v. N. Y. ex rel. Tipaldo,* cited in the opinion of the court, as I read that opinion, has squarely held that the fixing of a minimum wage by a state is a matter which the Fourteenth amendment prohibits because it denies due process to the wage earner by denying to him liberty to fix his wage by contract with his employer. It is manifest that, if wages may not be fixed at all by act of the state legislature, they cannot be fixed on the ground that they are necessary to

prevent unfair trade practices, whether they in fact are necessary for that purpose or not.

The opinion of this court herein states by way of avoidance of the rule of the *Morehead Case* that "while the *Morehead Case* affirms and follows the *Adkins Case,* neither of these cases dealt with the matter of wage and price in relation to matters which are concededly within the power of the legislature to regulate." But the matters involved in each of these cases were precisely as much "concededly within the power of the legislature to regulate" as are unfair trade practices. "The declared purposes [of the act involved in the *Adkins Case*] were to protect women from conditions detrimental to their health and morals, resulting from wages inadequate to maintain decent standards of living. § 23." *Morehead Case,* 298 U. S. 587, 56 Sup. Ct. 918, 920. That was the purpose of the New York act involved in the *Morehead Case.* That act declares it to be against the public policy of the state to pay a wage "less than sufficient to meet the minimum cost of living necessary for health," and to forbid employment of women at an "oppressive and unreasonable wage." §§ 551 (7) and 552, Labor Act. The object of the act was to provide such a wage in order, to apply the language of the *Adkins Case,* page 529, to protect women "from conditions detrimental to their health and morals, resulting from wages which are inadequate to maintain decent standards of life." As stated in the dissenting opinion of Mr. Chief Justice Hughes in the *Morehead Case:* "The legislature [of New York] deemed it essential to seek the correction of these evils [evils expressly declared by the act to exist] by the exercise of the police power 'for the protection of industry and of the women and minors employed therein and of the interest of the community at large in their health and well-being and in the prevention of the deterioration of the race.' § 550 (Labor Law)." Notwithstanding

this, the court ruled that the power assumed did not exist in the legislature because it was negatived by the due process clause of the Fourteenth amendment. Surely the things aimed at in the act involved in those cases would concededly be within the power of the legislature to regulate, if the regulation did not violate the constitutional prohibition. And surely these things are as important, as greatly affect the welfare of workers and of society as a whole, as do "unfair trade practices." The welfare of the worker is the object of our statute precisely as of the statutes involved in the *Morehead* and *Adkins Cases,* and if that object cannot be reached by statutes aimed directly at protection of the health and morals of the workers, it cannot be reached by a statute aimed ultimately at that object but directly at preventing "unfair trade practices."

In the opinion of the court, a statement is quoted from the *Adkins* opinion to the point that the fixing of a minimum wage has no relation to the morals of women workers. However, I find nothing in the opinion to the effect that the wage received by women workers has no relation to their health. Manifestly, if women wholly dependent on their own earnings for support do not receive a wage sufficient to furnish them with food and raiment sufficient to sustain them in health, the establishment of a wage sufficient for that purpose has relation to the exercise of the conceded police power to provide for the health of citizens, and it may properly be said that it reasonably bears a much closer and more direct relation to the exercise of police power than the establishment of a minimum wage has to the exercise of that power in order to prevent unfair trade practices.

The opinion of the court herein denies the appellant relief because he did not first seek review of the provision of the code he attacks through appeal to the code authorities as provided in the act. If it be conceded that that method of

review must be resorted to respecting matters with which the code may constitutionally deal, it cannot apply to matters with which it cannot so deal. If the code cannot deal with the matter at all, why go through the form of reviewing the facts upon which the provision of the code objected to was based? If it matters not whether those facts justify the finding of necessity of the provision to prevent unfair trade practices, why should one have to inquire whether such finding was justified? The act involved in the *Morehead Case* involved a determination by designated authorities upon investigation of the facts that fixing a minimum wage was necessary for the purposes of the act. The supreme court of the United States took it as "granted" that, if the legislature had the power "to establish and enforce minimum wages, that power has [had] been validly exerted." They "assumed that the rates [of wage] have [had] been fairly made in accordance with the procedure prescribed by the act and in full compliance with the defined standards," and squarely held that the state could not "enter upon regulation of the sort undertaken by the challenged enactment." On this assumption the court held that "The *Adkins Case,* unless distinguishable, requires [required] affirmance of the judgment" of the New York court and then held that the *Adkins Case* was not distinguishable. The opinion then states:

"The state court rightly held that the *Adkins Case* controls this one and requires that relator be discharged upon the ground that the legislation under which he was indicted and imprisoned is repugnant to the due process clause of the Fourteenth amendment."

That the decision of the *Morehead Case* was directly to the point that the state legislature cannot establish a minimum wage under any circumstances, except as expressed in the quotation from the opinion below given, is made clear, to my mind at least, by the following quotations from that

opinion. The question involved is stated as "whether the state has power . . . to subject to state-made wages all adult women employed in trade, industry or business, other than house and farm work. These were the questions decided in the *Adkins Case*." The opinion, after pointing out that, while in the *Adkins Case* an act of congress was involved, the restraint imposed upon congress by the Fifth amendment respecting due process is the same as the restraint respecting it imposed upon state legislatures by the Fourteenth amendment, goes on to state:

"This court's opinion shows (261 U. S. 525, at pages 545, 546, 43 Sup. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238): The right to make contracts about one's affairs is part of the liberty protected by the due process clause. Within this liberty are provisions of contracts between employer and employee fixing the wages to be paid. In making contracts of employment, generally speaking, the parties have equal right to obtain from each other the best terms they can by private bargaining. Legislative abridgement of that freedom can only be justified by the existence of exceptional circumstances. Freedom of contract is the general rule and restraint the exception. This court has found not repugnant to the due process clause statutes fixing rates and charges to be exacted by businesses impressed with a public interest, relating to contracts for the performance of public work, prescribing the character, methods and time of payment of wages, fixing hours of labor. Physical differences between men and women must be recognized in proper cases and legislation fixing hours or conditions of work may properly take them into account, but (261 U. S. 525, at page 553, 43 Sup. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238) 'we cannot accept the doctrine that women of mature age, *sui juris,* require or may be subjected to restrictions upon their liberty of contract which could not lawfully be imposed in the case of men under similar circumstances. . . . Enough has been said to show that the authority to fix hours of labor cannot be exercised except in respect of those occupations where work of long continued duration is detrimental to health.'"

That the question decided by the *Adkins Case* was the broad one whether the fixing of wages could be done by a legislature under any circumstances except as stated is made apparent, not only by the opinion of the court in that case, but by the dissenting opinion of Mr. Justice HOLMES, who said:

"The question in this case is the broad one, Whether congress can establish minimum rates of wages for women in the District of Columbia with due provision for special circumstances, or whether we must say that congress has no power to meddle with the matter at all."

After stating and quoting as above from the *Adkins Case* opinion, the opinion in the *Morehead Case* says:

"Clearly they [the dissenting justices] understood—and rightly—that, by the opinion of the court, it was held that congress was without power to deal with the subject at all."

The only cases in which the fixing of wages or prices has been allowed by the supreme court of the United States have been in connection with "businesses impressed with a public interest." In the *Adamson Law Case* (*Wilson v. New*, 243 U. S. 332, 37 Sup. Ct. 298), a minimum wage fixed by act of congress was upheld. In *Nebbia v. New York*, 291 U. S. 502, 54 Sup. Ct. 505, the fixing of the price of milk in New York city area by the legislature of New York, was upheld. That the railroad business is "impressed with a public interest" is manifest. The milk business involved in the *Nebbia Case* was shown to be so impressed and was directly held to be so impressed in that case. These cases mark the extreme limit of the application of the rule excepting "businesses impressed with a public interest" from the constitutional bar against price fixing and wage fixing. It will hardly be contended by anyone that the barbers' trade or the painters' trade is "impressed with a public interest," especially in the face

of the limitations of such business laid down in the *Oklahoma Ice Case* (*New State Ice Co. v. Liebmann*), 285 U. S. 262, 277, 52 Sup. Ct. 371. If these trades are so impressed, then there is no trade or business that is not so impressed and the constitutional bar imposed in the *Morehead Case* is entirely removed. It is true that much is said in the opinion in the *Nebbia Case* that by way of argument may be said to conflict with the rule of the *Morehead Case*. But the latter is the latest pronouncement of the supreme court of the United States on the subject directly involved, and that pronouncement, as I view it, should rule the instant case.

While the wage of men was not directly involved in the *Adkins* or *Morehead Cases,* the fundamental reason for denying the right to fix wages as to women was that the right does not exist as to men. It appears from the statement above quoted that restrictions upon the liberty of women to contract cannot be imposed that cannot be imposed upon men, and from later statements in the *Morehead* opinion that the "factual situations" advanced as supporting the fixing of women's wages apply equally to the fixing of wages for men.

The opinion of this court goes upon the assumption that the only matter the supreme court of the United States considered in the *Morehead Case* was whether it could be distinguished from the *Adkins Case.* It states:

"The decision in the *Morehead Case* was expressly limited by the court to whether there were any grounds upon which it could be distinguished from the *Adkins Case.*"

I find nothing in the opinion so "expressly limiting" it. The opinion not only shows that the *Morehead Case* cannot be distinguished from the *Adkins Case,* but it shows that the rule of the *Adkins Case* is still the law of the land. It says:

"This court, on the authority of the *Adkins Case* and with the acquiescence of all the justices who dissented from the

decision, held repugnant to the due process clause of the Fourteenth amendment statutes of Arizona and Arkansas, respectively, fixing minimum wages for women. *Murphy v. Sardell,* 269 U. S. 530, 46 Sup. Ct. 22, 70 L. Ed. 396; *Donham v. West-Nelson Mfg. Co.* 273 U. S. 657, 47 Sup. Ct. 343, 71 L. Ed. 825. We have adhered to the principle there applied and cited it as a guide in other cases. *Meyer v. Nebraska,* 262 U. S. 390, 399, 43 Sup. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446; *Wolff Packing Co. v. Industrial Court,* 262 U. S. 522, 534, 43 Sup. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; *Ribnik v. McBride,* 277 U. S. 350, 356, 48 Sup. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327. See *Near v. Minnesota,* 283 U. S. 697, 707, 708, 51 Sup. Ct. 625, 75 L. Ed. 1357."

The opinion points out that in the *Arizona* and *Arkansas Cases,* the rule of the *Adkins Case* was attacked and its overruling sought, but that the court "after thoughtful attention to all that was suggested against that decision, adhered to it as sound."

The opinion of this court seems to imply that we held in the *Tavern Code Authority Case,* 220 Wis. 25, 264 N. W. 633, that every provision is valid if only it bears a reasonable relation to the matter of unfair trade practices and unfair competition, even if it is upon a subject upon which legislation is prohibited by the United States constitution. Had I so understood that decision, I certainly should not have let it pass without dissent. My understanding was, and is, that if a code provision is upon such a subject, that provision is necessarily unconstitutional. For example, if a code provision should declare existing contracts at less than the minimum wage established by a code abrogated or of no force or effect, I would think that provision invalid because contrary to the provision of the United States constitution prohibiting a state from enacting a statute impairing the obligation of contracts. I think that the justices uniting in the

decision of the court would agree with me on that proposition, no matter how close the facts upon which it was based should bear to unfair trade practices and unfair competition. If the law is as I think it is declared by the *Morehead Case,* the situation is no whit different in principle from the one above suggested. Whenever the police power runs up against a constitutional prohibition it must yield to it. *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 42, 91 N. W. 115.

It is suggested in the opinion of the court that the statute involved in this case may perhaps be distinguished from the one involved in the *Morehead Case* by the declaration of the statute that it is emergency legislation. I understand that when emergency legislation runs counter to a provision of the United States constitution it is invalid, emergency or no emergency. That proposition, if it needs any buttressing, has been directly declared by the supreme court of the United States: "Extraordinary conditions do not create or enlarge constitutional power." *A. L. A. Schechter Poultry Corp. v. United States,* 295 U. S. 495, 528, 55 Sup. Ct. 837; *Home Bldg. & Loan Asso. v. Blaisdell,* 290 U. S. 398, 54 Sup. Ct. 231. We have here, in my view, a question of constitutional power. Wage fixing was considered as such a question in the *Adkins Case,* as the quotations from that case above given show.

The decision of this court denies relief to the appellant on the ground that he did not first seek relief by asking the code authority to strike from the code its wage-fixing provision. I am of opinion that from the procedural viewpoint also the statute denies to appellant due process. As pointed out in the opinion of the court, the procedure for review is as in workmen's compensation cases. The provision there is that "within thirty days from the date of the order or award of the [industrial] commission as a body any party aggrieved thereby may commence, in the circuit court for Dane county,

an action against the commission for the review of such order or award, in which action the adverse party shall also be made defendant." Sec. 102.23 (1), Stats. In the proceeding before the industrial commission both the wage earner and his employer are parties thereto. The employer has been haled into the proceeding by notice. In proceedings before the governor for establishing a code, neither any employer nor any worker is a party. Neither employer nor employee is given any notice. True, conceivably, some employers and some employees, perhaps, may appear before those who may have in charge the preparation of a code, or before the governor before he promulgates it. But no notice of any kind to anybody is anywhere provided. How anybody can be conclusively bound by any provision of a code when he has had no notice of the proceedings by which it has been promulgated, or who has had no notice of the date of its promulgation, merely because he did not take action before the governor to set it aside within thirty days of the date of its promulgation, is beyond my comprehension. The provision for taking such action to review within thirty days from promulgation of the order when one has had no notice of the time of promulgation is not due process. It cannot be made such by any stretch of liberality in matters of practice. The legislature certainly cannot by delegating to the governor the preparation and promulgation of a code foreclose a person affected by the code so promulgated from attacking by court action a provision denying him his constitutional rights by a provision respecting review that it could not constitutionally declare if the provision had been established by its own direct act. Had the legislature established the provision of the barbers' code here involved by enacting it into a statute and provided in the act that no person affected by the provision could attack it on constitutional grounds except by court action taken within thirty days from the publication of the act,

could it be successfully contended that the limitation upon court review was constitutional? The instant situation in no way differs in principle from the one suggested.

The opinion of the court seeks to avoid the thirty-day time limit by saying that the court understands that the code authorities do not in fact require applications for review by them to be made within the time limited by statute from the date of the promulgation. It is held that, if the action to review an order of the industrial commission is not commenced by service of a summons within thirty days from the date of the order, the court has no jurisdiction to review the order. *Gough v. Industrial Comm.* 165 Wis. 632, 162 N. W. 434; *New Dells Lumber Co. v. Industrial Comm.* 166 Wis. 207, 164 N. W. 824; *Milwaukee-Western Fuel Co. v. Industrial Comm.* 172 Wis. 561, 179 N. W. 763. It is also settled that this court has no jurisdiction to review an order or judgment unless appeal to it is made within the statutory time. *Herrick v. Racine Warehouse & Dock Co.* 43 Wis. 93; *Hall v. Gilman,* 90 Wis. 455, 63 N. W. 1044. It seems to me strange indeed that, while neither the supreme court nor the circuit court can acquire jurisdiction to review an order when application for review is not made to it within the time limited by statute, that the governor acquires jurisdiction to entertain a review if he sees fit to do so although the period for appealing to him has expired. If one should apply to the governor for a modification of a code more than thirty days after its promulgation, this would be an entirely distinct proceeding in which he would be permitted to introduce facts showing the ground on which he sought modification. It would not be a review of the facts on which the code was based. Jurisdiction to entertain such a review is limited by the thirty-day provision just as a court review is so limited by the Workmen's Compensation Act.

It is said in the opinion of the court that the decision of this court in *Corstvet v. Bank of Deerfield,* 220 Wis. 209, 263 N. W. 687, rules the point now under consideration against the appellant. If it does, I fear that we erred in that decision. However, there is a wide difference between the situations of the appellant in that case and the appellant in this. Every depositor of all the banks in the state was not affected by the ruling of the banking commissioner in that case, as it is here decided that every employer and every employee in the state engaged in the barber trade is bound by the promulgation of the barber code. Only the depositors in the Deerfield Bank were affected by the action of the banking commissioner there involved. The appealing depositor certainly knew of the pendency of the stabilization proceedings which resulted in the approval of the banking commissioner of the agreement which he had declined to sign. He was, by his refusal to sign, a party to the stabilization proceedings just as much as were the depositors who signed it. He knew, presumably, at least there was no suggestion that he did not know, of the date of the commissioner's approval in time to appeal to the banking review board within thirty days if he desired to attack the approved agreement. The appealing depositor might not unreasonably be held to have had such notice of the stabilization proceedings and of the banking commissioner's action as constituted due process. In no sense was the appellant here a party to any proceeding before the governor or before those who by his appointment were charged with drafting the code in the first instance. By no stretch of reason can a barber in Superior, three hundred miles from the offices of the governor and his appointees, be considered to have had notice of any proceeding or hearing before them or of the promulgation date of the code. But, whether the holding of the *Corstvet Case* was right or

wrong, I cannot subscribe to the doctrine that the appellant here has had the notice and opportunity to be heard in court that is essential to due process.

For the reasons above stated, I am of opinion that the order of the circuit court overruling the demurrer to the complaint should be reversed.

I am authorized to state that Mr. Justice FAIRCHILD and Mr. Justice NELSON concur in this opinion.

A motion for a rehearing was denied, without costs, on January 12, 1937.