Wisconsin Employment Relations Board, Respondent, vs. Milk & Ice Cream Drivers & Dairy Employees Union, Local No. 225, Appellant.

*April 18—October 7, 1941.*

380

382

For the appellant there were briefs by *Padway; Goldberg & Tarrell,* and oral argument by *I. E. Goldberg* and *David Previant,* all of Milwaukee.

For the respondent there were briefs by the *Attorney General, James Ward Rector,* deputy attorney general, and *N. S. Boardman,* assistant attorney general, and oral argument by *Mr. Boardman.*

A brief was also filed by *Walter H. Bender* of Milwaukee, as *amicus curiæ.*

The following opinion was filed June 25, 1941:

FOWLER, J.    The proceedings involved were duly instituted by the Wisconsin Employment Relations Board upon the petition of the Golden Guernsey Dairy Co-operative against the Milk & Ice Cream Drivers & Dairy Employees Union, Local 225, under ch. 111, Stats. 1939, hereinafter referred to as "the act," enacted in furtherance of "the public policy of the state as to employment relations and collective bargaining." Secs. 111.06 (1) and (2) of the act declare "What are unfair labor practices." Sec. 111.07 by sub. (1) provides that any controversy concerning such practices may be submitted to the board; by sub. (4) that after hearing the board shall "make and file its findings of fact" and "its order," and that the order may dismiss the charge or require the person complained of to cease and desist from an unfair labor practice found to have been committed; and sub. (7) provides that if a person against whom an order runs fails or neglects to

obey it the board may bring an action in the circuit court to enforce it. In the instant case the board made an order against the union, the union ·did not comply with it, and the board brought an action to enforce it. The union asked the court to set aside the order. The circuit court sustained the order and entered its judgment of enforcement, and from that judgment the union appeals.

After the judgment of the court was entered and notice of its entry given to the union, the board by petition to the circuit court charged that the union, its officers, and certain members wilfully and contumaciously committed acts in violation of provisions of the court's judgment and asked that they be dealt with as in contempt of the court. The court by order required the defendant union to show cause why it should not be so dealt with. The union by answer denied in part committing the acts charged and admitted them in part and claimed justification of the admitted acts under the free-speech clause of the United States constitution and the Fourteenth amendment. Upon hearing had before the judge who rendered the judgment, the president, vice-president, and secretary of the union were adjudged guilty of contempt of court 'and punishment therefor was imposed. The defendant officers so adjudged appeal to this court. The two appeals were argued and submitted together and are treated in this opinion.

The findings of fact made by the board on which the order involved is based are serially numbered from 1 to 19, inclusive. The union in its brief assigns as error that the court erred in sustaining these findings of fact because they are not supported by "credible and competent evidence." The credibility of the evidence was for the board to determine. No incompetent evidence is pointed out, unless the claim of incompetency is that the evidence is not "substantial" or "more than a scintilla." It is conceded that to be of probative force to support findings, evidence must be of this nature. The brief does not

point out specifically any of the nineteen findings as not supported by the evidence. The findings of the board, if supported by credible and competent evidence, are conclusive. Sec. 111.07 (7), Stats. The party on whom the burden of proof rests is required to sustain the burden by a clear and satisfactory preponderance of the evidence. Sec. 111.07 (3). We will first consider whether the evidence supports the facts found that fall under pars. (f) and (g) of sec. 111.06 (2), Stats.

Sec. 111.06 (2) (f), Stats., declares it an unfair labor practice for an employee to do any act "to hinder or prevent, by mass picketing, . . . the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment, or to obstruct or interfere with the free and uninterrupted use of public roads, streets," etc.

Sec. 111.06 (2) (g), Stats., declares it an unfair labor practice for employees "to combine or conspire to hinder or prevent, by any means whatsoever, the obtaining, use or disposition of materials, equipment or services," etc.

Sec. 111.06 (3), Stats., of the act provides that "it shall be an unfair labor practice for any person to do or cause to be done . . . in connection with or to influence the outcome of any controversy as to employment relations any act prohibited by subsections (1) and (2) of this section."

Therefore if the board found on sufficient evidence that the union "caused to be done" any acts in violation of pars. (f) and (g), above stated, it had power to issue an order requiring the union to cease and desist from the commissions of those acts, and its order so far as it required the union to cease and desist from such acts was valid and the judgment of the court was not in error in confirming such cease-and-desist order.

That the union "caused to be done" the picketing and all other acts recited in the statement of facts preceding the opinion is beyond dispute. Therefore such of those acts as

constituted unfair labor practices the board properly required the union to cease and desist from doing and the court properly adjudged to be enforced.

The board by paragraph a of its finding of fact numbered 15 found that beginning early April 5th, while the company was loading its delivery trucks a picket line formed and passed to and fro in front of the company's plant. The number in line during the loading period frequently numbered from forty to ninety-five. The pickets marched slowly two by two, back and forth, with short steps, and close together. Policemen present were forced on an average of eight to ten times each morning to break or open this line to permit entrance and emergence of the trucks. The interference and delay thus caused made it necessary for the company to employ additional help to approximate its usual loading time. After the delivery trucks left the plant, the number of pickets decreased, but picketing continued throughout the day and into the night. It decreased somewhat after commencement of the proceeding before the board, but with such decrease all these acts continued down to the time of trial. By this finding the board in effect found that by mass picketing the union hindered the pursuit of lawful work of the company, and that it obstructed and interfered with entrance and egress to and from the company's plant.

By paragraph b of finding 15 the board found that the automobiles sent by the union to follow the company's delivery trucks to their places of delivery on many occasions cut in ahead of the trucks, impeded their progress, and prevented their proper parking in making deliveries, and generally interfered with the free and unobstructed use of the streets by the trucks, and endangered the safety of the drivers and the property of the company. It also found that at places of delivery there was frequent interference by the picketing carried on by the occupants of the automobiles with the free and unob-

structed use of the sidewalks by the company drivers. These findings of the board are clearly supported by the evidence, and constituted such hindrance of the pursuit of lawful work and such obstruction of ingress and egress to and from the plant and of the use of the public streets and sidewalks as to constitute violations of both pars. (f) and (g) of sec. 111.06 (2), Stats., as to warrant the cease-and-desist order of the board and of the judgment of the court so far as they pertain to such practices. This is sufficient to warrant affirmance of the cease-and-desist orders of the court, as everything else in the general terms of the judgment, all being as to things which the union had no right to do, did not harm or prejudice the union. The only paragraph of the judgment that requires the union to cease and desist from doing any specific acts is paragraph a of division 1. That paragraph requires the union, its officers and members, to "cease and desist from coercing or attempting to compel . . . [the company] by picketing its plant, obstructing the ingress to or egress from its plant, interfering with its delivery trucks or the drivers of the same, picketing the residences or places of business of any of the complainant's customers, exercising any form of coercion toward or intimidation of any such customers, or in any other way, to make or enter into a labor contract with the respondent [union] containing an all-union or closed-shop provision." The board and the court specifically found that the things mentioned were done for the ultimate purpose of compelling the company to enter into an all-union contract. The union contends that there is no evidence to support this inference of fact, but we consider that the inference is warranted. It is to be noted, as held in *Century Building Co. v. Wisconsin E. R. Board*, 235 Wis. 376, 382, 383, 291 N. W. 305, that, although the board's findings must be supported by a clear and satisfactory preponderance of the evidence, when a case gets before the circuit court for review the board's findings must be sustained if there is any credible

evidence to support them. Paragraph 1a of the judgment plainly implies that the union must cease and desist from doing the specific things mentioned therein, and being in contravention of pars. (f) and (g) of sec. 111.06 (2), Stats., the union could be and was properly required to cease and desist from doing them.

The union contends that the picketing done at the places of business of the company's customers was not aimed at the owners of these places and that these places therefore were not picketed, but that the picketing involved was only of the trucks and their drivers. We regard this contention as sophistry. In our opinion it constituted a picketing of the places of business before which it occurred. Counsel also claim that the acts done did not constitute coercion or intimidation of the customers. That it did not constitute putting in fear of physical harm is true, but it is plain that it did constitute coercion.

We do not find it necessary to consider any other provisions of the cease-and-desist provisions of the judgment except paragraphs c, e, and h. All of the cease-and-desist provisions are set out in the margin.[1]

---

[1] It is therefore ordered and adjudged, that the respondent . . . its officers, agents, members and successors, do and shall—

1. Cease and desist from—

a. Coercing or attempting to compel the complainant [Golden Guernsey Company, a corporation, hereinafter referred to as the "complainant"], by picketing its plant, obstructing the ingress to or the egress from its plant, interfering with its delivery trucks or the drivers of the same, picketing the residences or places of business of any of the complainant's customers, exercising any form of coercion toward or intimidation of any such customers, or in any other way, to make or enter into a labor contract with the respondent containing an all-union or closed-shop provision.

b. Coercing in any way or attempting to compel the complainant to interfere with its employees in the exercise of their legal right to refrain from being subject to a labor contract containing an all-union or closed-shop provision.

c. Publicly asserting in any way that the complainant is unfair to organized labor or to the respondent union, unless such charge is

It will be observed on inspection that all but paragraphs c, e, and h are general in their terms. None other mentions any specific act. It is contended that the acts done by the union respecting the matters covered by the other provisions did not constitute "coercion" or "intimidation." If not, then these acts are not under the ban of the judgment. As to paragraphs c and h, they ban asserting that the company is "unfair to organized labor or to the respondent union." Some of the placards proclaim the company as "unfair to organized labor, Local 225." Because of this we consider c and h proper. There may be some question, at least there is some contradiction in the authorities, as to whether doing or refusing to do certain acts render an employer "unfair," but there certainly can be no controversy over the proposition that an employer is not "unfair" when his only act is refusing to do and refraining from doing what the law forbids him from doing. All the company has done in this case, if the evidence produced by the company is believed, and the board and the trial court properly believed it, is to refuse to sign an all-union contract and to refrain from trying to influence its employees in respect to joining or not joining the independent union or the defendant union, and to refrain from interfering with its employees in

---

based upon some reason other than that the complainant has declined to enter into a labor contract with the respondent containing an all-union or closed-shop provision.

d. Intimidating in any way the employees of the complainant in the exercise of their legal right to work for the complainant without molestation.

e. Hindering by threats or intimidation of any sort the disposition by the complainant of its merchandise or services to its customers, and the obtaining, use or disposition by the customers of its merchandise or services.

f. Engaging in or conducting any secondary boycott of any customer of the complainant.

g. Exercising any form of coercion toward or intimidation of any of the complainant's customers.

h. Asserting to any of the complainant's customers that the complainant is unfair to organized labor or to the respondent union because the complainant has declined to enter into an all-union or closed-shop labor contract with the respondent.

respect to their choice of a bargaining representative or their attitude as to an all-union contract. It has done nothing proscribed by sec. 111.06 (1), Stats., which declares what shall constitute unfair labor practices by an employer. Par. (c) of sub. (1) of said section by necessary implication proscribes an employer's entering into an all-union labor contract unless three fourths of his employees constituting a collective-bargaining unit have voted therefor. The board found, and the court confirmed, that the company "has not dominated or interfered in any way with any of its employees in the exercise of their legal rights respecting organization or collective bargaining or any rights granted or referred to" in ch. 111, Stats., relating to "Employment Relations." This finding is supported by the evidence.

Counsel cite recent decisions of the United States supreme court to the proposition that it is proper in labor controversies to placard that an employer is unfair: *Lauf v. E. G. Shinner & Co.* 303 U. S. 323, 58 Sup. Ct. 578, 82 L. Ed. 872; *Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc.,* 311 U. S. 91, 61 Sup. Ct. 122, 85 L. Ed. 63; *Fur Workers Union v. Fur Workers Union, Local No. 72,* 308 U. S. 522, 60 Sup. Ct. 292, 84 L. Ed. 443. We find nothing in these cases bearing on the proposition here involved. It merely appears from them that signs of the nature stated were involved therein, but whether they were truthful or untruthful is not discussed or mentioned. It may be conceded that if an advertisement charging unfairness gives the facts on which it is based in connection with the statement of unfairness this would not of itself be an improper labor practice. But under the facts of this case, including the ban against publishing the bald statement of unfairness in the cease-and-desist order of the board, and in the judgment of the court, was proper.

Paragraph e of the judgment bans "hindering . . . by threats the obtaining [or] . . . use by the company's customers of its merchandise or services." So doing is in con-

travention of par. (g) of sec. 111.06 (2), "combining to hinder or prevent by threats" or "to combine to hinder or prevent by any means whatsoever, the obtaining, use or disposition of materials, equipment or services." As to threats, one of the wholesale customers who protested against picketing in front of his store was told by a picketer that the union would so picket as long as he took milk from the company drivers, and the picketing itself was plainly a threat to that effect. We consider that there was enough in the case to warrant inclusion in the cease-and-desist portion of the judgment the use of threats against customers by the picketers. Besides, if there were only isolated instances of such threats, no harm results to the union from including the ban in the judgment, as confessedly the union has no right so to threaten.

We consider that we have covered sufficiently the contents of the cease-and-desist order of the court. If those provisions are in point of law such as the court might properly enter, those provisions of the judgment of the court must be sustained. The only contention of the appellant that those provisions are erroneous is that they violate the free-speech and free-press provisions of the United States constitution and are therefore prohibited by the Fourteenth amendment. This contention is based upon three recent decisions of the United States supreme court: *American Federation of Labor v. Swing,* 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855; *Thornhill v. Alabama,* 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093; and *Carlson v. California,* 310 U. S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104. It is true that cases of state courts are cited pro and con upon this proposition, also cases of inferior federal courts. But it is in our opinion entirely useless to cite or to consider any of these cases or any cases of the United States supreme court except such as have been rendered by the court as now constituted. The only cases decided by that court as now constituted that appear to us to afford any

light upon the three next above mentioned are the flag case, *Minersville School District v. Gobitis,* 310 U. S. 586, 60 Sup. Ct. 1010, 84 L. Ed. 1375, and the recent case of *Milk Wagon Drivers' Union of Chicago, Local 753, v. Meadowmoor Dairies, Inc.,* 312 U. S. 287, 61 Sup. Ct. 552, 85 L. Ed. 836. These cases indicate that there are limits beyond which the present court will not go to invalidate police regulations of the state because violative of the rights of religious freedom and freedom of speech and to reverse factual findings of state courts under the common law. The *Meadowmoor Dairies Case, supra,* it is true, goes upon the proposition that the act involved had a "background" of extreme violence. The picketing involved was claimed to be lawful under the rule of the *Carlson* and *Thornhill Cases, supra.* Paragraph 4 of the syllabus to the opinion in the *Meadowmoor Case* sufficiently indicates the holding and such applicability as it has to the instant case:

"Picketing which in itself is peaceful may be coercive when set in a background of violence." (85 L. Ed. 837.)

With like reason may it be said that picketing which is unlawful is not justified on the ground that it is a proper exercise of the right of free speech. Paragraph 5 of the syllabus reads:

"The supreme court of the United States cannot say that the finding of a state court that a momentum of fear generated by past violence may survive even though future picketing may be wholly peaceful, so contradicts experience as to warrant rejection." (85 L. Ed. 837.)

With like or greater reason, the supreme court of the United States may not say that the statutory provisions above referred to contained in pars. (f) and (g) of sec. 111.06 (2), Stats., so contradict experience and reason as to warrant rejection.

It is said in *American Furn. Co. v. I. B. of T. C. & H. of A.* 222 Wis. 338, 367, 268 N. W. 250, that the terms of a statute

"cannot be stretched to permit a union to enforce by picketing demands which the employer may not lawfully accede to." No more may this be done by court decisions. Picketing that so aims is unlawful although it is free from violence. That is just what the picketing here involved is carried on to enforce. It is carried on to enforce the union's demand that the company enter into an all-union contract, and that as heretofore pointed out the company cannot do because such contract cannot under sec. 111.06 (1) (c), Stats., be entered into unless voted by three-quarters of its employees. The case of *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 479, 57 Sup. Ct. 857, 81 L. Ed. 1229, is particularly relied on by appellant to support the instant picketing, because of its upholding of the picketing there involved because it was peaceful. But the picketing there involved was held to be lawful. The opinion plainly implies that had it been unlawful, it would not have been justified though free from violence, and the minority of the court was of opinion that the picketing was unlawful and therefore not justified notwithstanding its freedom from violence. As to this see further *infra.*

We find nothing inconsistent between the provisions of the cease-and-desist order covered by pars. (f) and (g) of sec. 111.06 (2), Stats., and the *Thornhill, Carlson,* and *Swing Cases, supra,* on which the union so confidently relies. In none of these cases was the picketing involved carried on for an unlawful purpose. No statutory violations were involved in the *Swing Case.* The opinion of the court, page 323, states the issue to be merely, "is the constitutional guaranty of freedom of discussion infringed by the common-law policy of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate employer-employee dispute?" It is also stated in the opinion, page 325:

"All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picket-

ing *en masse* or otherwise conducted' so as to occasion 'imminent and aggravated danger.' "

We should not extend the rule of that case beyond the point at which the court itself stopped. Here we have violations of the statutes above mentioned as to which no question of constitutionality is raised.

All that was decided in the *Thornhill Case, supra,* p. 94, reducing it to its lowest terms, is that the statute there involved was void because it forbade picketing that was free from violence and in which the pickets only said that "they were on strike and did not want anybody to go up there to work." The picketing involved in the *Thornhill Case* was free from violence, but picketing is not lawful merely because it is free from violence. It is said by the United States supreme court in the *Senn Case, supra,* that picketing to be peaceful must not only be free from violence, but there must be "absence of any unlawful act. . . . It [peaceful picketing] precludes any form of physical obstruction or interference with the plaintiff's business." As above pointed out, there was here physical obstruction and physical interference with the company's business, both by mass picketing which is expressly excluded from consideration in the *Thornhill Case,* and which is there conceded to be subject to inhibition when properly particularized, and by obstruction to and interference with ingress and egress and use of streets, the latter to such an extent as to endanger safety of persons and property.

The *Carlson Case, supra,* involved violation during a strike of an ordinance by picketing, but it seems to be sufficiently distinguished from the instant situation by the statement in the opinion, page 110, that—

"During this period [of picketing, 7 :30 to 9 a. m.] vehicles and persons passed freely without any molestations or interference through the picket line from the highway to the project and from the project to the highway, and the traffic

of persons and automobiles along the highway was not obstructed."

As to violations of pars. (f) and (g) of sec. 111.06 (2), Stats., the instant case is clearly distinguished. As to the sign displayed, "This job is unfair to C. I. O.," it is comparable to the sign "The Golden Guernsey Company is unfair to organized labor and Local 225," but the case is without evidence, as here, establishing that the employer was in fact not "unfair." The opinion does not mention the matter of unfairness, or whether the signs conveyed true or false statements.

The court in the *Senn Case, supra,* in saying, page 479, "Senn did not contend that it was untruthful to characterize him as 'unfair,' if the requirement that he refrain from working with his own hands was a lawful one," plainly implies that one charged with being "unfair" may prove the fact to establish that he is not unfair, and that if he so establish, to placard him as unfair is unlawful. To assert that one is unfair to organized labor may properly be adjudged to be an unfair labor practice where, as here, the evidence shows that the assertion is false.

Since submission of the case appellant's counsel have by letter called attention to a *per curiam* decision of the supreme court of the United States announced June 2d, *Bakery and Pastry Drivers & Helpers Local 802 v. Wohl and Platzman,* 313 U. S. 548, 61 Sup. Ct. 1108, 85 L. Ed. 1513. The only pertinent part of the decision reads: "Judgment reversed, *American Federation of Labor v. Swing,* decided February 10, 1941." As the ruling was based on the *Swing Case, supra,* entirely, it affords no additional support to the appellant's contention. As in the *Swing Case,* no statutory provisions were involved and the ruling rested upon common law. Reference to the *nisi* opinion of the New York supreme court, 14 N. Y. Supp. (2d) 198, shows that the case was

brought in equity to enjoin the union from picketing in furtherance of a secondary boycott. An injunction issued. Both the New York appellate division and the court of appeals affirmed the *nisi* ruling. Neither wrote an opinion. Par. (g) of sec. 111.06 (2), Stats., declares a secondary boycott "an unfair labor practice."

We believe the above sufficiently covers the claims of appellants respecting errors affecting the judgment of the court sustaining the board's order, except the claim that the board improperly rejected evidence offered by the union.

The rejected evidence was offered as of probative force in support of the union's contention that the company was "unfair" to organized labor. The items of rejected evidence will be briefly stated and our ruling given. (1) The president of the company was active in promoting the enactment by the legislature of ch. 111, Laws of 1939, and repealing the then existing ch. 111, Stats., which resulted in the creation of the present and abolished the then existing labor board. We fail to perceive that this has probative force upon the question of the company's fairness or unfairness toward the union. (2) The secretary of the union was asked what arguments were presented at the meeting of the union on April 4th relating to the questions submitted to vote at that meeting. Objection to the question was properly sustained. (3) The president of the company was asked whether any complaints were made to him as to unlawful acts by any of the strikers and offered to show that none was made. The objection was properly sustained, and testimony properly rejected. (4) A question was asked whether a route foreman of the company had engaged in antiunion activities. Objection to it was properly sustained. (5) A question was asked whether employees quit their employment with the company because of domination by the company over the independent union. The objection was properly sustained.

As to the contempt matter, it seems not open to question that the appellants charged with contempt were properly adjudged guilty if they intentionally and knowingly violated any of the provisions of the judgment. It is said in *State ex rel. Attorney General v. Fasekas,* 223 Wis. 356, 358, 269 N. W. 700:

"The order and judgment of the court finding the defendant, Fasekas, guilty of contempt must be sustained on the authority of *State ex rel. Fowler v. Circuit Court* (1898), 98 Wis. 143, 73 N. W. 788, and *John F. Jelke Co. v. Beck* (1932), 208 Wis. 650, 242 N. W. 576. The defendant acted in entire disregard of the court's order, claiming that the code, under and pursuant to which the order was made, was invalid and unconstitutional. The defendant flouted the court and contumaciously refused to abide by an order made by a competent court having jurisdiction over his person and the subject matter of the controversy. Whether the order was right or wrong, it was the duty of the defendant to obey it until relieved therefrom in some one of the ways prescribed by law."

Under the rule above stated, it was the duty of the union and its officers and members to obey the provisions of the judgment of the court until they were reversed on appeal or by the trial court set aside, modified, or declared to be no longer in force in some proper proceeding. Whether the provisions of the judgment were right or wrong in point of law is immaterial upon the proposition of obedience to them under the rule stated. We have first to determine whether the trial court was correct in adjudging that the defendants charged with contempt intentionally committed acts in violation of those provisions.

The court found, and it is not disputed, that the union continued to picket the company's main plant after the rendition of the judgment and the service of notice of its entry and of its terms upon the defendant union each day from early in the

morning to 6 o'clock at night by pickets working in regular shifts; that said picketing consisted of from two to five pickets walking the sidewalks in front of the Golden Guernsey plant, one of whom wore an apron bearing the legend front and back: "2,000 milkmen from Local 225 beg your support. Do not patronize Golden Guernsey Dairy Employees." The same type of picketing was carried on during the same hours daily at the Golden Guernsey ice-cream plant and store located across the street from the main plant. The court also found that the union, for the purpose of injuring the Golden Guernsey Company, caused to be parked daily, at or near an advertising sign of the Golden Guernsey Company in the form of an immense milk jug located on one of the main approaches to the city, one or more automobiles from 5 to 7 o'clock p. m., and having a sign thereon bearing the legend above stated. This practice was not begun until after the judgment of the court affirming the order of the board was rendered.

The court further found that the union has continued to have the delivery trucks followed by automobiles, substantially as before entry of judgment, except on Sundays, and with signs as next above stated. Picketing at the places of the wholesale customers at times of delivery also continued as before the judgment. One or two occupants of the cars walked before the customer's place of business carrying a sign as next above stated. The extent to which the union has continued its violation of the provisions of the court's judgment, and the results of such continued violations, is stated in two of its findings that are sustained by the evidence, as follows:

"The union employed pickets to follow the wholesale route drivers of the Golden Guernsey while engaged in the delivery of milk to customers. Such practice has been persistent and continuous, except on Sundays; but it is not usually continuous throughout the entire route. Such following is usually a few car lengths behind the Golden Guernsey trucks, whose

drivers in a number of instances have attempted to operate their trucks in such a manner as to cause their pursuers to lose sight of them. On one occasion a Golden Guernsey truck driver was pursued in Racine county at a speed of forty to fifty miles per hour by pickets, who, after overtaking the Golden Guernsey truck, drove ahead of it in such a manner as to cause the driver of the latter to fear that his truck would be ditched. When the route driver of the Golden Guernsey reaches the customer's place of business one or two pickets engage in picketing the place of business of the customer, regardless of the position of the route driver's truck. The pickets who follow the route driver usually park their automobiles very close to the rear of the route driver's truck while the latter is delivering milk. This surveillance and following of the company's truck drivers on wholesale routes has continued and, in recent days, has been conducted with increased vigor and persistency. . . .

"The methods employed by the union in following the Golden Guernsey trucks tend to endanger public traffic and to impair the driving control of the Golden Guernsey drivers."

Other specific findings of fact were made by the circuit judge, none of which we deem it necessary to set out, because the facts above stated sufficiently show that the cease-and-desist order of the court was disobeyed by picketing at the plant, by following the company trucks, and by picketing the stores of the wholesalers. The union contends that the facts stated did not constitute a violation of the order because the facts found were not aimed at the company or its customers but only at the drivers. The judgment banned the picketing, regardless of at whom it was aimed. The picketing at the plant was obviously a picketing of the company notwithstanding that the placards used subsequent to the entry of the judgment read "Golden Guernsey employees" instead of "Golden Guernsey Company." The mere device of pasting the word "employees" over the word "company" on these placards as was done, did not change the effect of the picketing of the plant of the company, or the picketing of the wholesale cus-

tomers during the times of delivery. As stated in discussion of the main case, paragraph a of the cease-and-desist portion of the judgment plainly required the union to cease and desist from picketing the company plant and the stores of its wholesale customers and so following the company trucks with automobiles as to endanger traffic or interfere with or obstruct the free use of the streets by the company trucks and drivers. Whatever else was involved in their acts did not obviate or evade the violations thus found.

The court further found that the president, vice-president, and secretary-treasurer of the union, the persons charged with contempt of court, intentionally and deliberately planned and instigated the acts found to have been committed:

"(a) In an attempt to exert compulsion upon the Golden Guernsey to enter into an all-union agreement with said union; (b) in an attempt to exert compulsion upon the Golden Guernsey to interfere with its employees in the exercise of their right to freely select their own bargaining agency without interference in their right to refrain from being subject to an all-union agreement; (c) in an attempt to intimidate the employees of the Golden Guernsey in the exercise of their right to work for that company without molestation; (d) in an attempt to hinder by intimidation the disposition by the Golden Guernsey of its merchandise and services to its customers and the obtaining, use and disposition by its customers of its products and services; and for the purpose of causing such customers to cease buying and receiving the products and services of said company until such all-union agreement shall have been entered into between the company and its employees."

The court further found, as bringing the proceedings within sec. 295.01, Stats., prescribing the procedure in contempt-of-court cases, that these acts "were calculated to, and actually did, defeat, impede and prejudice" the rights and remedies of the board, who were the petitioners in the contempt proceedings, who have the right and are charged with the duty to

prosecute the instant enforcement procedure under ch. 111, Stats. 1939, and that these acts have caused and are causing injury to the Golden Guernsey Company and to its employees.

Under these findings the conviction and sentence by the court was correct and must be affirmed unless the court erred in not granting a jury trial on the appellants' motion therefor or in denying their motion to have another judge called in on the filing of an affidavit of prejudice against the trial judge.

Like motions, based on the same statute (sec. 268.27 (3) and (4), Stats. 1931; sec. 103.60 (3) and (4), Stats. 1939), were made in *John F. Jelke Co. v. Beck,* 208 Wis. 650, 660, 242 N. W. 576. It was there held, page 660, that both motions were properly denied because the provision relied on only applied to proceedings involving "a labor dispute as that term is defined in the act." The "act" involved was ch. 376, Laws of 1931, which created secs. 268.18 to sec. 268.30, Stats. 1931, now secs. 103.51 to 103.63, Stats. 1939. Sec. 268.27 then provided as sec. 103.60 now provides that:

"In all cases where a person shall be charged with civil or criminal contempt for violation of a restraining order or injunction issued by a court or judge or judges thereof, the accused shall enjoy: (1) . . . (2) . . . (3) . . . [right of jury trial]. (4) The right to file with the court a demand for the retirement of the judge sitting in the proceeding, upon an affidavit of prejudice being filed as is now provided by law in other cases. . . ."

We consider that neither par. (3) nor (4) of sec. 103.60, Stats., is applicable to the instant proceeding. While by their terms these paragraphs cover cases of contempt arising out of a labor dispute and provide for change of venue and a jury trial therein, it was held in the *Jelke Case, supra,* that the section containing these paragraphs was not intended to have and does not have any application to the exercise by a court of equity in cases other than those growing out of a labor dispute

as that term is defined in the act. This implies that the provision was intended to apply only to cases in equity brought to enjoin unlawful acts enjoinable under the rules of equity jurisprudence which make unlawful acts and irreparable injury essential to confer equity jurisdiction. Thus, if in such an action, assuming, but not deciding, the constitutionality of par. (3) under the grant of equity powers of courts of equity by our state constitution, a court should issue an injunction or restraining order, and a person should be charged with its violation, the provision for a jury trial would apply. In the *Jelke Case, supra,* although the action was one in equity for an injunction, the right to a jury trial was held not to exist because the action had no relation to a labor dispute. Here, by parity of reasoning, par. (3) does not apply to the instant proceeding because the proceeding is not an action in equity for an injunction. It is not a proceeding cognizable by a court of equity to enjoin an unlawful act causing irreparable injury, but a statutory proceeding to review and enforce an order of an administrative board. That right to a jury trial under sec. 103.60 (3) and (4) refers only to injunctions issued in equity cases, appears clearly from the previous sections relating to injunctions immediately previous to sec. 103.60, secs. 103.56 and 103.57, wherein the nature of the action contemplated is particularly shown. By par. (b) of sec. 103.56 (1), substantial and irreparable injury to property must exist; by par. (c) greater injury will result to plaintiff by denying relief than to defendant by granting it; and par. (e) plaintiff has no adequate remedy at law. None of these things need exist to authorize a cease-and-desist order in actions for enforcement of the board's orders. We therefore hold that the provision for a jury trial does not apply to the instant case, and that the right to trial before another judge does not exist because that provision, like that for a jury trial, exists only in a case invoking the equity jurisdiction of the court.

It is true that a trial court in New York has ruled (*Boland v. Parisi*, 18 N. Y. Supp. (2d) 698) that a provision of the New York code of civil procedure, similar to sec. 103.60, Stats., prescribing a jury trial in contempt proceedings for violation of an injunction issued in an equity case involving a labor dispute applies to violation of a cease-and-desist order issued in a proceeding before the New York labor board. Being a decision of a trial court it is at best of no higher status than the court whose decision we are reviewing. We do not accept it as governing our instant ruling.

It follows that the order of the circuit court must be affirmed.

*By the Court.*—The judgment and order of the circuit court are affirmed.

A motion for a rehearing was denied, without costs, on October 7, 1941.